SAMBS, Respondent, v. CITY OF BROOKFIELD, Appellant.

*No. 301. Argued November 25, 1974.—Decided January 7, 1975.*
(Also reported in 224 N. W. 2d 582.)

For the appellant there were briefs by *Hippenmeyer, Reilly & Arenz* of Waukesha, and oral argument by *Richard S. Hippenmeyer.*

For the respondent there was a brief by *V. John Burggraf* of Milwaukee, attorney, and *Wickert & Fuhrman* of Brown Deer and *Aaron Belongia* of Milwaukee, of counsel, and oral argument by *Mr. Belongia.*

CONNOR T. HANSEN, J. This appeal presents issues both as to determination of causal negligence on the part of the defendant and the trial court's finding of waiver

of the statutory limitations of liability by the city. There-
fore, we deem it desirable to review the evidence in
considerable detail. The issues raised on the negligence
trial and the waiver trial will be considered separately.

### Negligence trial.

On the evening of February 20, 1965, the plaintiff and
his friends, Nowak, Thomas Wayne Kurth, Dale Smith
and Larry Pfeil, went to a beer bar in Ixonia, Wisconsin,
in Nowak's car. After drinking a few shorty beers, they
left the bar at approximately 12:30 a. m., February 21,
1965, and stopped for gas in Oconomowoc. Nowak asked
Smith if he would like to drive, which Smith did until he
and Pfeil had been let off at their homes. Nowak then re-
sumed the driving and was in the process of taking the
plaintiff to his home on Lisbon Road when the accident
occurred.

Nowak testified that he turned off Calhoun Road onto
Lisbon Road and was proceeding in an easterly direction
at approximately 30 to 35 miles per hour. Plaintiff was
lying on the back seat of the car asleep, and Kurth was in
the front seat also asleep. Nowak testified that the night
was clear and that the roads were dry. He had not seen
any ice on the roads prior to reaching Lisbon Road.
However, as he proceeded east on Lisbon Road and as he
started to climb a slight incline, the car caught a rut in
the road and started pulling to the right shoulder.
Nowak responded by turning the wheel but could not
prevent the car from going into a spin and striking a
utility pole some 400 feet east of where the car first
began to slide.

The plaintiff crushed two vertebrae and severed his
spine in the accident and is now paralyzed from his waist
down.

The investigating patrolman, now Sergeant Robert
Wolterstorff, who was called by the plaintiff, testified

that he found no ice ruts near the scene of the accident, nor water on the road, but that the road was icy with frost. This testimony was disputed by that of John Nowak, the driver's father, also called by the plaintiff, who stated that he found ice ruts and glare ice on Lisbon Road near the scene of the accident during his inspection of the scene at 10 a. m. on February 21, 1965. John Nowak also took pictures, allegedly on Monday, February 22, 1965, showing ice on Lisbon Road and the city work crews using a steam hose to free the ice from the culvert under the road so that the water which had accumulated on the surface would drain off.

The defendant called the city street superintendent, Robert L. Leonard, who produced records indicating that the only steaming done in the area was on March 1, 1965, not February 22, 1965. It was noted, however, that there was no measurable precipitation between February 21 and March 1, 1965, and that the temperature had remained constantly below freezing during that period.

The plaintiff also called Audrey and Clyde E. Dundon, who lived near the scene of the accident on Lisbon Road. They both testified that the driveway culverts on the south side of the road were inadequate and that the drainage ditches overflowed onto the road every time there was a substantial thaw. Audrey Dundon stated that traffic going through the water would spread it all over the road. They testified that they had complained to the city about the problem on numerous occasions in the twenty-two years they lived there, but that nothing was ever done. This testimony was also confirmed by George J. Scherer who lived in the area and stated that the road was frequently covered by water during the winter months.

Roland A. Kohlbeck, a chief sanitary engineer for a private consulting firm, also testified for the plaintiff. Kohlbeck stated that in his opinion the culverts under the

driveways on the south side of Lisbon Road were of inadequate size to handle the flow of water to be anticipated from a thaw of the watershed area. The inadequate size contributed to the likelihood that they would be blocked by ice. He stated that the undersized culverts, or blocked culverts, or freezing conditions, or a combination of those factors, would prevent the water from going under the road in the box culvert provided. It was his conclusion that the unseasonably warm temperatures experienced on February 20, 1965 (48 degrees) caused a large runoff in the area which the culverts were unable to handle, causing flooding on the road. Given flooding on the road, and rapidly dropping temperatures (40 degrees at 9 p. m. to 26 degrees at 3 a. m.), the traffic on the road would break the surface ice on the water, track the water with the tires to the east, which water would refreeze at different levels creating ruts. The smallest of the driveway culverts which Kohlbeck thought to be inadequate was located 440 feet from the pole which Nowak's car hit. The spot which Nowak indicated on a scale model exhibit as being the place where he first skidded was 400 feet from the pole.

The plaintiff introduced an agreement between the defendant and the county of Waukesha showing that the defendant had responsibility for maintaining Lisbon Road and the drainage system. Plaintiff also called Forrest G. Robinson, the city engineer, adversely, who testified that replacement of the driveway culverts would normally be done by the defendant-city.

The defendant, upon cross-examination of John Nowak, established that the ice ruts he had seen on February 21, 1965, after the accident, were in the area of the box culvert which ran under Lisbon Road some 300 feet west of the point where the car allegedly first began to skid. He stated the whole road was icy, but that he saw no ruts or water crossing the road where the skidding allegedly occurred.

Professor Paul Roys, a physicist, testified in behalf of the defendant. He stated that the dew point and temperature changes on the night in question were hypothetically right for the formation of frost. The defendant also established that numerous accidents occurred the night in question because of alleged icy conditions and that the sanding trucks had been sent out at 12:35 a. m. on the 21st because of radioed reports of icy spots around the city.

The defendant also introduced the testimony of Dennis D. Perry, an engineering technician but not an engineer, who worked for the defendant, to the effect that Kohlbeck was incorrect in his measurements of the box culvert going under Lisbon Road (24″ instead of 18″) and of the driveway culvert immediately east of the box culvert (18″ instead of 15″).

Based on this and other testimony, the jury found that the city was 30 percent causally negligent in failing to properly maintain and repair the highway and surface drains.

The following issues are raised on the question of the causal negligence of the defendant:

1. Did the trial court err in failing to instruct the jury as to the three-week requirement of sec. 81.15, Stats., for "natural" accumulations of ice?

2. Did the trial court err in failing to submit the question of plaintiff's contributory negligence to the jury?

3. Was the evidence sufficient to sustain the verdict that the defendant was causally negligent in breaching its duty to repair and maintain the road and drainage systems?

*Natural accumulation.*

The trial court denied the request of the defendant for an instruction in regard to the three-week require-

ment of sec. 81.15, Stats., and as to the definition of "natural." Sec. 81.15 provides, in part:

"**81.15 Damages caused by highway defects; liability of town and county.** If damages happen to any person . . . by reason of the insufficiency or want of repairs of any highway which any . . . city . . . is bound to keep in repair, the person sustaining such damages shall have a right to recover the same from such . . . city . . . . The amount recoverable by any person for any damages so sustained shall in no case exceed $25,000. No action shall be maintained to recover damages for injuries sustained by reason of an accumulation of snow or ice upon any bridge or highway, unless such accumulation existed for 3 weeks."

This court has held that the three-week requirement of the statute applies only where the accumulation is "natural" as opposed to "artificial." *Kobelinski v. Milwaukee & Suburban Transport Corp.* (1972), 56 Wis. 2d 504, 202 N. W. 2d 415; *Stippich v. Milwaukee* (1967), 34 Wis. 2d 260, 149 N. W. 2d 618; *Laffey v. Milwaukee* (1958), 4 Wis. 2d 111, 89 N. W. 2d 801; *Laffey v. Milwaukee* (1959), 8 Wis. 2d 467, 99 N. W. 2d 743.

The plaintiff contended that the accident occurred because improperly maintained or otherwise inadequate drainage facilities caused water to spread on the road which then froze forming ruts. The defendant contended that the accident was caused by the driver's negligence coupled with slippery conditions on account of frost on the road.

As early as 1884, this court held that where a correct instruction upon a material point is requested in time, and there is evidence to support it, it is error to refuse it unless an equivalent instruction is given. *Sailer v. Barnousky* (1884), 60 Wis. 169, 171, 18 N. W. 763.

While the trial judge could have appropriately given the requested instruction, based on the defendant's evidence of frost on the road, his failure to do so does not

constitute prejudicial error. This is particularly so in view of the fact that the jury, by its verdict, accepted the evidence of the plaintiff and rejected that of the defendant.

However, the defendant also contends that even under the plaintiff's theory of the case, the instruction was required because an issue was presented as to whether the alleged accumulation of water on the highway on account of the drainage system was a "natural" or "artificial" accumulation. The defendant maintains that this was properly an issue of law for the trial court to decide, but failing that, it should have been submitted to the jury.

To date, this court has treated the "natural" versus "artificial" issue as a question of law. *See, e.g., Kobelinski, supra; Stippich, supra; Laffey, supra.*

In *Kobelinski, supra,* this court held that an accumulation of snow piled on the curb near a sidewalk when the walk was cleared, was not an artificial accumulation. This ruling was based in part on the decision that it would not be consistent to permit a city which had not shoveled its walks at all to be immune for three weeks while yet holding liable a city which had partially cleared its walks by leaving the snow on the curb. *Kobelinski, supra,* page 515. In *Stippich, supra,* this court held leaving snow on a sidewalk where it had fallen did not create an artificial accumulation. In *Laffey* (1958), 4 Wis. 2d, *supra,* this court determined that ice which formed on a sidewalk because the city firemen had discharged water thereon, constituted an artificial accumulation of ice.

This court's decision in *Stippich, supra,* extended the common-law rules of negligence and nuisance to cases in which a city is sued. Therefore, it is appropriate to examine the question of "natural" versus "artificial" accumulations as considered in the cases involving private parties. Thus, in *Smith v. Congregation of St. Rose* (1953), 265 Wis. 393, 61 N. W. 2d 896, this court held

that where allegedly defective and clogged gutters on a roof caused an accumulation of water from melted snow in one spot which overflowed the gutter and formed ice on the sidewalk below, the accumulation was artificial. In so holding, this court noted that absent any gutters the water would have flowed off the roof evenly, but that with defective gutters it accumulated "artificially." *Smith, supra,* page 398. In *Johnson v. Prange-Geussenhainer Co.* (1942), 240 Wis. 363, 2 N. W. 2d 723, an accumulation of ice on a sidewalk was held to be artificial when deposited there by a defective drainpipe, but in *Plasa v. Logan* (1952), 261 Wis. 640, 53 N. W. 2d 720, an accumulation of ice was termed natural when water from drains, which were properly working, found its way to the sidewalk.

Thus, the cases finding an "artificial" accumulation of ice to date have been of two classes. The *Laffey Case* represents a class where the ice exists because of the affirmative act of discharging water where water would not otherwise have been. The *Smith Case* and the *Johnson Case* represent a situation where the presence of a normal amount of water would be anticipated, but where it was allowed to accumulate because of a negligent omission by the party sought to be liable; *i.e.,* the failure to keep a drainage system in repair.

We are of the opinion that the present case falls within the second classification and that the accumulation was "artificial." The rule with regard to the improper drainage of runoff water forming ice has been stated to be that there is a duty to provide proper drainage where it is known to the public authority that a dangerous condition exists. *See:* 39 Am. Jur. 2d, *Highways,* p. 916, sec. 516. In this case there is evidence that the city had notice that its failure to provide an adequate drainage system created a hazardous situation, and, therefore, it had a duty to remedy the defect. Also, because of such notice the city had a duty to inspect the system it pro-

vided for its continued adequacy and to prevent blockages and obstructions having the same result. *See: Freitag v. Montello* (1967), 36 Wis. 2d 409, 153 N. W. 2d 505; *Trustees of University Co-operative Co. v Madison* (1939), 233 Wis. 100, 288 N. W. 742; 18 McQuillin, *Municipal Corporations* (3d ed. rev.), pp. 468–471, sec. 53.123, and pp. 476, 477, 483, sec. 53.125.

The *Kobelinski Case* is not in point as the issue here is not whether the city was negligent in failing to remove, or in the manner in which it attempted to remove, the ice once it accumulated, but whether the city negligently caused its accumulation. The purpose of the three-week requirement of sec. 81.15, Stats., was stated by this court to be to give the municipalities plenty of opportunity to learn of and remove snow and ice resulting from natural precipitation, not to provide immunity for cases where the municipality has itself negligently created the icy condition. *Laffey* (1958), 4 Wis. 2d, *supra,* pages 114, 115. The ice in this case was allegedly on the road only because of the negligently maintained drainage system; a condition that was known or should have been known to the defendant long before the incident in question, at least because of the numerous complaints made by the Dundons. If the three-week immunity statute was held to be applicable to the facts here presented and believed by the jury, it would have the effect of permitting the city to treat the problem symptomatically after each thaw regardless of whether the drainage system was defective. We conclude the instructions of the trial court on this issue were proper.

*Contributory negligence.*

The defendant contends that the trial court erred in not submitting the question of the plaintiff's passive contributory negligence to the jury.

The passive negligence of a guest-passenger of an automobile is predicated on an unreasonable willingness of the passenger to proceed in the face of a known hazard for which the driver is responsible, as viewed under the circumstances of the case. *McConville v. State Farm Mut. Automobile Ins. Co.* (1962), 15 Wis. 2d 374, 378, 385, 113 N. W. 2d 14; *Theisen v. Milwaukee Automobile Mut. Ins. Co.* (1962), 18 Wis. 2d 91, 103, 118 N. W. 2d 140, 119 N. W. 2d 393. A question of law is presented only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion. *Bishop v. Johnson* (1967), 36 Wis. 2d 64, 68, 152 N. W. 2d 887.

The defendant asserts that there was sufficient evidence of a hazard to create a jury issue as to the reasonableness of the plaintiff's decision to ride with Nowak. Defendant points to the fact that Nowak had been drinking beer; that on the way to the beer bar Nowak was asked to slow down because he was driving too fast; and that the drivers had switched at the gas station on the way back from the bar. The defendant further indicates that the length of the skid marks, the degree to which Nowak lost control of the car on Lisbon Road, and the obvious forceful impact with which the car hit the pole, all raise the inference that the drinking of beer adversely affected Nowak's driving which was a substantial factor in causing the accident.

Nowak testified that he drank three or four shorty beers in the two hours he was at the bar. However, the plaintiff left the bar after an hour to lie down in the car because he wasn't feeling well. There is nothing in the record to indicate the plaintiff knew what transpired in the bar after he went outside. Kurth, one of the other boys in the car, testified that on the way to the bar, they had told Nowak to slow up on one road because it was "gravelly," and that Nowak immediately complied. Kurth further testified there was nothing abnormal about

Nowak's driving from the beer bar to the gas station. The plaintiff also testified that it was Nowak who asked Smith if he wanted to drive from the gas station. Moreover, both Kurth and the plaintiff stated that the night was clear and that the roads were dry so far as they observed before going to sleep during the drive home.

This court has held that the knowledge of the guest that the driver has drunk intoxicating liquor before driving does not necessarily make the guest contributorily negligent for his own safety in riding with the driver. *Bishop v. Johnson, supra,* page 67. However, it has also been said that evidence of drinking by the driver to the knowledge of the passenger, normally creates a jury question. *Bishop v. Johnson, supra; Vandenack v. Crosby* (1957), 275 Wis. 421, 82 N. W. 2d 307; *Steinkrause v. Eckstein* (1920), 170 Wis. 487, 175 N. W. 988.

Under the facts of this case the plaintiff was not negligent in riding with Nowak as a matter of law. It was not error for the trial court not to submit a question on the contributory negligence of the plaintiff.

### Sufficiency of the evidence.

The question presented on review of a jury verdict is whether there is any credible evidence which, under any reasonable view, fairly admits of inferences to support the verdict. *Reshan v. Harvey* (1974), 63 Wis. 2d 524, 217 N. W. 2d 302; *Holzem v. Mueller* (1972), 54 Wis. 2d 388, 195 N. W. 2d 635; *Bergmann v. Insurance Company of North America* (1970), 49 Wis. 2d 85, 181 N. W. 2d 348.

The question submitted to the jury was:

"*Question Three:*
"Prior to and at the time of the accident in question, was the City of Brookfield negligent with respect to the maintenance or repairs of the highway in question including the surface water drains?"

This was followed by the normal causation question. The jury answered both questions in the affirmative.

Defendant's primary contention is that there was no credible evidence establishing the existence of water on Lisbon Road from improper drainage facilities in the area where Nowak testified he started to skid.

The plaintiff testified that he drove on Lisbon Road the morning before the accident and saw water standing in the dips of the road in the approximate location that the skidding allegedly occurred. The water was deep enough so you "could hear the tires cutting the water," and it was being tracked out of the dips by the traffic in both directions.

George J. Scherer, Audrey and Clyde E. Dundon, residents of the area, all testified that during the winter months, especially during thaws, there was water on the road due to an overflow of the drainage system. The flooding generally occurred between Meadow View West and Calhoun Road. The alleged skidding occurred between these two roads approximately 150 feet west of Meadow View. Mrs. Dundon further testified that when the road floods, the traffic sprays the water around wetting the whole street. Both Mr. and Mrs. Dundon testified that they had notified the defendant of the problem on numerous occasions but that nothing had been done, although it was frequently necessary for the defendant to unclog the driveway culverts by steaming out the ice.

Plaintiff's expert sanitary engineer, Roland A. Kohlbeck, testified that the driveway culverts between Meadow View West and the box culvert going under Lisbon Road were of inadequate size to handle a thaw in the watershed area. He stated that the unusually high temperatures of the day would have caused a large runoff which the driveway culverts would have been unable to handle causing flooding on the road. He noted that the

smallest driveway culvert, and inferentially the most inadequate, was located where Nowak later testified he had started to skid. In his opinion, a thaw of the frost in the ground would have created a runoff sufficient to fill and overflow this culvert. Finally, Kohlbeck testified that traffic going through the water on the road, where the temperatures were dropping, would create tracking and the formation of ice ruts.

Finally, there was credible evidence that there was an agreement between defendant and the county which showed an assumption by defendant of maintenance responsibility with respect to the material portion of Lisbon Road, including maintenance of the drainage system along the south side of the road. Forrest G. Robinson, the defendant-city's engineer, during the period in question, called adversely by the plaintiff, testified that replacement of driveway culverts found to be deteriorated or inadequate was part of his department's responsibility.

In our opinion, the foregoing testimony and the reasonable inferences to be drawn therefrom constitute sufficient credible evidence to support the verdict. While there was conflicting evidence as to the location of the water on the road, the jury could properly conclude that there was water on the road at the point where Nowak's car skidded; that the water had frozen forming ice ruts; that the condition was caused by the defendant's failure to properly maintain the driveway culverts; that the defendant had adequate notice of the defective condition of the driveway culverts; and that the negligence of the defendant was a substantial factor in causing the accident.

We have considered the other issues raised by the defendant on the negligence issue and do not find them to be persuasive.

*Waiver trial.*

At the trial to the court on the issue of waiver, the following evidence was presented.

The plaintiff introduced two insurance policies purchased by the defendant, one covering July 1963–64 and the other July 1964–65. The former policy had liability coverage, exclusive of automobile coverage, of $200,000 per person and $500,000 per occurrence. The latter policy, which was the one in force at the time of this accident, raised these limits to $500,000 and $1,000,000, respectively.

The defendant's insurance policy also covered the Joint School District as an additional named insured. According to Royal Tice, the former superintendent of the school, the defendant leased the school's playground facilities for recreational purposes on a cost basis. Because of this, and the school board's concern over a then pending suit against the district for $300,000, they requested that the defendant raise the liability limits on the policy to $500,000 in October, 1963. The defendant complied with the request and authorized the increase by resolution dated January 21, 1964. The additional premium for that partial year was $59.60.

The defendant further introduced the testimony of various attorneys and insurance experts to the effect that there was great uncertainty at the time the liability limitation statute was passed following this court's abolition of the doctrine of governmental immunity in *Holytz v. Milwaukee* (1962), 17 Wis. 2d 26, 115 N. W. 2d 618, as to the need for coverage beyond the statutory limit.

There was also evidence that the above-described policy limits for coverage "B" included coverage for bodily injury liability assumed by contract and by operation of law as well as by tort. The defendant introduced several easement agreements between itself and the Chicago, Milwaukee, St. Paul & Pacific Railroad Company, making

the defendant contractually liable for injury by reason of the defendant's easements.

Finally, the defendant called Carroll Dana, a representative of the insurance company, who testified that in computing the premium on the additional coverage, the insurance company had taken into account the availability of the $25,000 liability limitation in the statutes, but still graded the premium at a 25 percent factor because of a possibility that the limitation would not be available. Dana also testified that the city would have saved about $130 in premiums if they had had $25,000–$1,000,000 coverage.

The plaintiff called Howard M. Patton, a highly experienced insurance agent, who testified that most or all of the special coverage problems of the defendant such as the school district and the contractual liability under the easement agreement, could have been handled by special endorsement on the policy rather than raising the basic coverage. He admitted, however, that there were many gray areas of liability which might not be covered by the statutory limitation that would justify obtaining the broader coverage.

The trial court found that because of the purchase of this insurance contract the defendant-city waived the statutory limits of liability established by secs. 81.15 and 895.43, Stats. We are of the opinion this decision must be reversed.

The following issues are presented on the issue of waiver of the statutory limitation of liability.

1. Are secs. 81.15 and 895.43, Stats., to the extent that they limit the liability of the defendant, unconstitutional?

2. Did the trial court correctly determine that the defendant had waived the statutory limits of liability?

*Constitutionality of liability limit.*

The plaintiff contends that the liability limitations of secs. 81.15 and 895.43, Stats., are unconstitutional under

the equal protection clauses, fourteenth amendment, sec. 1, of the United States Constitution, and art. I, sec. 1, of the Wisconsin Constitution, and under the remedy clause, art. I, sec. 9 of the Wisconsin Constitution.

The plaintiff did not raise these issues in the trial court. This court has consistently held that it will not entertain a constitutional issue raised for the first time on appeal unless there is some compelling reasons for doing so. *Milwaukee v. Shoup Voting Machine Corp.* (1972), 54 Wis. 2d 549, 196 N. W. 2d 694; *Resseguie v. American Mut. Liability Ins. Co.* (1971), 51 Wis. 2d 92, 186 N. W. 2d 236.

The damages in this case have not yet been determined and no compelling reason has been alleged or shown as to why we should reach this issue. On the basis of this record and the paucity of discussion in the briefs, this opinion will not consider the constitutionality of secs. 81.15 and 895.43, Stats. *See: Milwaukee v. Shoup Voting Machine Corp., supra,* page 557.

### *Waiver of liability limit.*

Secs. 81.15 and 895.43, Stats.,[1] impose a limit of $25,000 on the amount recoverable from the defendant in the present action unless it can be said that the defendant has waived that limitation. The plaintiff asserts that the defendant waived the limitations *pro tanto* when it purchased a liability insurance contract with larger limits. The trial court so found.

[1] Sec. 81.15, Stats., quoted, *supra;* sec. 895.43 (2), provides:

"(2) The amount recoverable by any person for any damages, injuries or death in any action founded on tort against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or agency thereof and against their officers, officials, agents or employes for acts done in their official capacity or in the course of their agency or employment, whether proceeded against jointly or severally, shall not exceed $25,000. No punitive damages shall be allowed or recoverable in any such action."

In *Marshall v. Green Bay* (1963), 18 Wis. 2d 496, 118 N. W. 2d 715, the city had purchased liability insurance and the contract specifically provided that the insurer would not raise the defense of governmental immunity. This court held that when the city purchased liability insurance and the contract contained such a clause, the defense of sovereign immunity was waived *pro tanto* to the limits of the policy purchased. The *Marshall v. Green Bay Case* was decided after the *Holytz Case* which abolished substantive sovereign immunity but before the effective date of that case which was prospectively applied. In support of the *Marshall* holding, this court relied upon the notion that the defense clause in the policy indicated an intention on the part of the city to provide recovery where it "ought to exist." *Marshall v. Green Bay, supra,* page 501.

In *Marshall v. Green Bay, supra,* page 502, it was stated:

"We do not hold, however, a municipality waives its immunity when it takes out a liability policy which does not contain the condition or agreement to refrain from raising the defense of governmental immunity."

In cases subsequent to the *Marshall Case,* this court has refused to extend the waiver rule to cases where the waiver of immunity defense clause was not set forth in the insurance policy. *Wojtanowski v. St. Josaphat's Congregation* (1967), 34 Wis. 2d 1, 148 N. W. 2d 54; *Niedfelt v. Joint School Dist.* (1964), 23 Wis. 2d 641, 127 N. W. 2d 800; *Koenig v. Milwaukee Blood Center, Inc.* (1964), 23 Wis. 2d 324, 127 N. W. 2d 50.

In the present case there is no clause in the insurance policy prohibiting either use of the immunity defense or reliance on the statutory liability limitation. A further distinction between the *Marshall Case* and the present case is that the plaintiff here is relying on a waiver of a legislatively imposed limitation, where in the *Marshall Case* this court found a waiver of the judicially created

doctrine of immunity. In *Marshall v. Green Bay, supra,* page 500, this court stated:

". . . The power of a city to waive its tort immunity need not rest upon an express grant of statutory authority. The immunity granted municipalities from tort liability was created by case law basically and primarily to protect public funds and property. Such immunity can be waived by the municipality when it has secured that purpose by insurance and believes a waiver to be advantageous or desirable. . . ."

The plaintiff has directed our attention to cases in other jurisdictions which have held that the defense of immunity can be waived without there being a specific clause in the insurance policy prohibiting the assertion of the defense. We do not find these authorities persuasive in view of the fact that the *Marshall Case* and the subsequent decisions of this court specifically reject this approach. Moreover, the question herein presented is not a waiver of judicially created immunity but waiver of a legislatively created limitation of liability.

The precise issue of this case was presented to the Nevada Supreme Court in *State v. Silva* (1970), 86 Nev. 911, 478 Pac. 2d 591. Like Wisconsin, Nevada has a statute permitting the purchase of liability insurance. *See:* Sec. 66.18, Stats. Nevada also has a statute imposing a $25,000 liability limitation. Unlike Wisconsin, Nevada abolished sovereign immunity by statute and it had not decided a case comparable to the *Marshall Case. See: Taylor v. State* (1957), 73 Nev. 151, 311 Pac. 2d 733. In disposing of the issue, the Nevada Supreme Court held that the legislature had authorized the purchase of insurance to the extent of $25,000 and that the purchasing of higher limits by the state could not be considered a waiver. *State v. Silva, supra,* at 917.

The defendant asserts that there is evidence of adequate reasons motivating the purchase of the insurance in

question to preclude the argument that the intent was to waive the liability limitations. On the other hand, plaintiff established that there were other ways of wording the insurance contract so as to provide the coverage thought necessary while still making it clear that the defendant could rely on the liability limitation in a proper case. Allegedly, such a properly worded policy would have been less costly, and it was upon this basis that the trial court found a waiver.

As the plaintiff notes, this court has held that absent ambiguity, the intent of the parties must be determined from the four corners of the insurance policy itself. *Limpert v. Smith* (1973), 56 Wis. 2d 632, 203 N. W. 2d 29. Looking to the policy, it is noted that the $500,000–$1,000,000 coverage "B" extends to liability assumed by contract as well as tort liability, and there is no clause prohibiting the assertion of the statutory liability limits as a partial defense to a tort action. The total absence of any language indicating waiver of the defense leads us to conclude the defendant did not intend to waive the partial defense when it purchased the instant contract of liability insurance.

The doctrine of sovereign immunity, as it relates to municipalities and once of judicial origin, has now been placed in the hands of the legislature. If this court were to interpret the general language of this insurance contract as a waiver of the now statutorily established limits of governmental liability, such a decision would spawn lack of uniformity in the state as to the limits of damage recovery. Some government subdivisions would act upon what they might conceive to be a moral obligation, while others would rest upon the statutory limitation of liability. Further consideration of the subject now properly rests in the legislature.

*By the Court.*—Judgment affirmed in part; reversed in part, and cause remanded.