Laurie L. GRUBER and James Gruber, Plaintiffs-Appellants,

v.

VILLAGE OF NORTH FOND DU LAC and Employers Insurance of Wausau, A Mutual Company, Defendants-Respondents.

Court of Appeals

*No. 03–0357.—Oral argument August 12, 2003.—Decided September 10, 2003.*

2003 WI App 217

(Also reported in 671 N.W.2d 692.)

370

On behalf of the plaintiffs-appellants, there were briefs and oral argument by *Kristi L. Fry* of *Fry Law Office, S.C.* of Fond du Lac.

On behalf of the defendants-respondents, there was a brief and oral argument by *Peggy E. Van Horn* of *Law Offices of Stilp & Cotton* of Brookfield.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. WISCONSIN STAT. § 81.15 (2001–02)[1] prohibits an action against a public authority to recover damages for injuries sustained by a natural accumulation of snow or ice upon a highway unless the condition existed for three weeks. The corollary, established by case law, is that actions based on artificial accumulations are actionable without the three-week requirement. *Laffey v. City of Milwaukee*, 4 Wis. 2d 111, 114–15, 89 N.W.2d 801 (1958). After examining the statute and case law, the trial court granted summary judgment to the Village of North Fond du Lac and dismissed the slip-and-fall complaint filed by Laurie L. Gruber and her husband James Gruber because it found as a matter of law that the ice was a natural accumulation and three weeks had not passed. We agree with the trial court that the ice was caused by natural accumulation. We further hold that the Grubers have waived the issue of whether the natural condition existed for longer than three weeks because it is raised for the first time on appeal. We affirm.

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 2. We will begin with the law. In Wisconsin, where land is graded or structures are built in the usual and ordinary way, and not for the purpose of accumulating and discharging water on a public sidewalk, drainage that results only incidentally and is not caused by negligent maintenance is deemed natural and ordinary. *Corpron v. Safer Foods, Inc.*, 22 Wis. 2d 478, 484, 126 N.W.2d 14 (1964). On the other hand, where the presence of a normal amount of water would be anticipated, but where it is allowed to accumulate because of the negligent omission of the party sought to be liable, such as a failure to keep a drainage system in repair, then it is an artificial condition and the governmental entity may be held responsible. *Sambs v. City of Brookfield*, 66 Wis. 2d 296, 306, 224 N.W.2d 582 (1975).

¶ 3. Our task is to determine which of the two categories the facts in this case falls into. Whether the condition is artificial or natural is a question of law. *Id.* at 305. We appreciate that we decide the case de novo without any deference paid to the trial court. However, that is not to say that we do not value the trial court's input. We do, especially when the trial court has engaged in a thoughtful and thorough review of the law, as was done here. *See Scheunemann v. City of West Bend*, 179 Wis. 2d 469, 475–76, 507 N.W.2d 163 (Ct. App. 1993). We therefore will discuss the trial court's reasoning and explain why we agree with it.

¶ 4. Since this comes before us as a review of a summary judgment, we entertain our review using the same methodology as the trial court. *Roebke v. Newell Co.*, 177 Wis. 2d 624, 632, 503 N.W.2d 295 (Ct. App. 1993). The summary judgment methodology has been

repeated often in appellate courts opinions and need not be recited again in great detail here. *Id*. Essentially, summary judgment should be granted where there is no genuine issue of material fact, and the moving party is entitled to summary judgment as a matter of law. *Id*. The summary judgment record reveals the following information:

¶ 5. Gruber slipped and fell on a patch of ice near the driveway/sidewalk area of 67 Harrison Street in the Village of North Fond du Lac. That area of Harrison Street runs perpendicular between Wisconsin Avenue on the west and Michigan Avenue on the east. There is an alley running parallel to Wisconsin Avenue and Michigan Avenue that is just to the west of where Gruber fell. The alley links up with Harrison Street. The address at 67 Harrison Street is the residence of the Hansens, friends of the Grubers.

¶ 6. At the time of her fall, Gruber was waiting to get into a Jeep that her husband was pulling up to the driveway after visiting the Hansens. At her deposition, Gruber testified that "there was water on top of the ice and my foot slipped out from underneath me and my ankle gave and I collapsed onto my leg because it was so slippery." Gruber also testified that the Hansens had warned her about the build-up of ice on the sidewalk. As a result of the fall, Gruber sustained a broken fibula, a broken tibia, torn ligaments and a dislocated foot.

¶ 7. Lori Hansen swore in a written statement that "[w]hen it rains or snow melts, the water runs down the alley to the street. Some of it runs towards our property, and runs down the sidewalk to our driveway." In another statement, she stated that she has lived there for three years and, for at least two of these years, she and her husband have had to deal with constant water/snow runoff from the adjacent alley. She said that

374

the water runs from the alley, "down our sidewalk and onto our drive where it pools and freezes." She averred that "we have had to continually fight this ice. We salt, sand and chop it, but it keeps coming back." She stated that "[f]or at least [two] years, I have complained to the village and asked them to fix this condition. First, they said it was just cosmetic." After Gruber fell, the Village added a catch-basin in the alleyway, which remedied the problem.

¶ 8. Michael Tolvstad, the Village public works director, was also deposed. He testified to his observations of the problem and one of Hansen's prior complaints. He testified that Hansen had contacted the Village about unusual summer water flow down the alley and sidewalk that had washed [grass] seed off her terrace. He said of that incident that there was a volume of water great enough to wash dirt off the terrace. Nonetheless, he saw no reason to repair the excess water flow since the only damage was loose dirt and seed.

¶ 9. Tolvstad also testified that he inspected the area after the Gruber slip-and-fall incident. He stated that "[w]e found in most situations the water would cross the sidewalk and go down the driveway approach coming into the alley and onto the street, and very heavy flows, then it would want to go across the terrace, but because of snow blocking the terrace, that it would divert down the sidewalk in those cases." Tolvstad also stated that water flows (east) down the sidewalk because the grade is higher on Wisconsin Avenue than Michigan Avenue. He stated that the sidewalk then became a sheet of ice because the water continually flows down the sidewalk and freezes. Tolvstad remarked that the catch-basin, once installed, alleviated the problem because the function of the basin was to

375

intercept the water before it left the alleyway such that it would no longer cross or run down the sidewalk.

¶ 10. Charles Hagberg, a registered professional engineer, was the Grubers' expert and was also deposed. He testified that a substantial amount of water drains down the alley because the elevation is higher towards the back of the alley and towards the sidewalk abutting Harrison Street. In his opinion, the water flow was the substantial source of the ice that formed on the Hansen property. He further opined that the alley was "designed and constructed in a manner that the water from the alley would go across the sidewalk at the alley and allow water to run down the sidewalk toward the Hansen property itself." Hagberg termed this to be an "alley drainage system" and he also opined that, before installation of the catch-basin, the system was inadequate. He based his conclusion on the reasoning that "the alley sloped towards the street and towards the sidewalk where the alley meets the street and the apron there, and they did not have a catch basin or some device that would prevent drainage of the excess water from the alley to the property." He called the slope "noticeable." He viewed the "system" as defective and believed the defect caused the accumulation of ice.

¶ 11. The trial court reviewed this same record and discussed each pertinent published decision on the subject. The court then focused on *Sambs*, which the trial court thought was the most definitive decision on the subject. The trial court read *Sambs* as requiring some evidence of faulty maintenance of an existing drainage system as a condition precedent to erasing immunity. It focused on the term used in *Sambs* where that court referred to a "negligently maintained drainage system." The trial court determined that there really was no evidence that the Village had, in this case,

a drainage system. "It was just an alley and the sidewalk. There is nothing that the City [sic] did not maintain properly or negligently." At another point in the decision, the trial court reasoned:

> And when I look at the facts of the Gruber case, our case, well, there really was nothing to tinker with or repair. It's just that's the way it was. There were no downspouts to be maintained. There were no culverts to clean or drainageways to keep open. It was just the way it was.

¶ 12. The trial court also found it instructive that the *Sambs* court saw the distinction being between whether the governmental authority was alleged to be negligent in failing to remove or in the manner in which it attempted to remove ice once it accumulated as opposed to whether the governmental authority caused its accumulation. If it was the former, it would not be actionable; if the latter, it would be. The trial court then said:

> There really is no evidence that the accumulation of snow and water and ice was the City's [sic] cause. It didn't dump the snow there by its trucks, or it didn't cause a fire worker to come back and spray the water. The snow—in my view, the snow and its water [were] there by act of Wisconsin weather.

¶ 13. In their brief, the Grubers provide a history of the trial court's decision that is not consistent with the record. For example, the Grubers stated, "The Defendants in this case argued that the accumulation of water, which constantly pooled into a sheet of ice on the Hansens' property, was a natural accumulation, using as a basis the fact that the Village's drainage system, even if defectively designed, was working as designed at the time of Laurie's accident. The trial court appeared

to accept that argument . . . in granting summary judgment." The Grubers then make various arguments all with the assumption that a drainage system did in fact exist and that the trial court had so found. For example, at one point in the brief, the Grubers argue that there was "nothing incidental about the accumulation of water in the alley and the intention to funnel it. It was simply funneled to a place not intended." At another point in the brief, the Grubers allege that "this is not a 'winter in Wisconsin' case, but rather a case where the Village's defectively designed drainage system was not working, and the failure of the Village's drainage system caused an artificial accumulation of ice." Based on our reading of the Grubers' brief, the Grubers claim that there was a drainage system in place, that it was negligently designed because it was unable to handle excess flow, that the trial court so found and also determined that the system was working properly at the time.

¶ 14. We disagree that this is the state of the record. The trial court never found as an undisputed fact that the alley next to 67 Harrison Street was "designed" to allow drainage to run down the alley towards Harrison Street where the water would enter a storm sewer. Rather, the trial court found the opposite as we pointed out above. Thus, the trial court did not accept as fact the allegation that there was a drainage system in place which was working properly at the time.

¶ 15. Based on that lack of evidence, the trial court determined that this was a case where mere topography created the flow. The topography, occasioned by the fact that certain streets were elevated in comparison to other streets, was not enough in the trial

378

court's opinion to decree that the resultant water flow was artificial rather than natural.[2]

¶ 16. Having clarified the state of the record, we now undertake our de novo review. The Grubers appear to make two contentions. First, they continue to read the record as showing that the alleyway was part of a drainage design system. From this, they argue that the design was flawed because it did not work when there was a heavy flow of water and therefore the water flow must be viewed under the law as artificial. Second, they appear to assert that, even if there was no actual drainage design system in place, the water flow must still be regarded as artificial because the Village knew or should have known that the way it paved its streets and alleys, with certain elevations and pitches, created a hazardous condition on Harrison Street which it then had a duty to address. We will discuss each of these contentions in turn.

[2] We acknowledge that at points in the Village's trial brief and again in its appellate brief, it appears to assert that the alleyway *was* part of a drainage design system. However, on closer inspection, the Village really did not take that position. Rather, the Village was merely stating its understanding of the factual record. In particular, the Village paraphrased its own expert, Michael Tolvstad, to have said in his deposition that "[i]t is not uncommon for the design of alleys to pitch down towards the roads slightly to allow runoff to reach the storm sewers. In fact, the alley next to 67 Harrison Street was designed to allow drainage to run down the alley towards Harrison Street where the water would enter the storm sewer." In actuality, what Tolvstad said was: "It's not unusual for water to run down sidewalks. The way the streets and sidewalks are constructed in most communities, they allow snow melt and rain to run down the sidewalk, typically to a driveway opening where it runs out onto a street." The Village's paraphrasing is erroneous. Tolvstad never said that the alley was part of a designed drainage system.

¶ 17. First, our review of the record leads us to the same determination that the trial court reached. There is absolutely nothing in the record to show that the alleyway was part of a drainage design system or that the alleyway was designed to pitch water from the alley onto Harrison Street and then into a storm sewer. Therefore, the facts show that the only forces causing the accumulation were the climate and topography and not unnatural diversions created by any man-made drainage system design flaw.

[6, 7]

¶ 18. Case law teaches that the presence or absence of a design system is integral to the success of the Grubers' case. There must be evidence that something man-made—such as a drainage system design or a downspout—was defective and that the defect caused the icy condition. For example, snow piled high on a curb, while man-made, is not "defective" such that it creates an artificial condition, at least in Wisconsin. *Kobelinski v. Milwaukee & Suburban Transp. Corp.*, 56 Wis. 2d 504, 515–16, 202 N.W.2d 415 (1972). Neither is leaving snow on the sidewalk considered to be a man-made "defective" condition rendering it artificial. *Stippich v. City of Milwaukee*, 34 Wis. 2d 260, 269–71, 149 N.W.2d 618 (1967). And where a man-made downspout is properly working and water finds its way from the rear of the building to a sidewalk, the accumulation is not considered artificial because while it was man-made, it was not defective. *Plasa v. Logan*, 261 Wis. 640, 644–47, 53 N.W.2d 720 (1952).

¶ 19. On the other hand, if ice forms on a sidewalk because the city firemen discharged water thereon, it is a man-made diversion that defectively causes an accumulation. *Laffey*, 4 Wis. 2d at 112–15. If allegedly

clogged and defective gutters on a roof causes an accumulation of water from melted snow in one spot which overflows into a gutter and forms ice on the sidewalk below, it is a man-made, defective condition which causes the problem and is considered artificial. *Smith v. Congregation of St. Rose*, 265 Wis. 393, 400–01, 61 N.W.2d 896 (1953) (overruled in part by *Widell v. Holy Trinity Catholic Church*, 19 Wis. 2d 648, 657, 121 N.W.2d 249 (1963), which created a new rule abolishing the immunity of religious institutions for negligence actions). Finally, where it is alleged that the driveway culverts are inadequate and the drainage ditches therefore overflow onto the road every time there is a substantial thaw, it is considered to be a negligently maintained man-made drainage system which causes the condition and is thus artificial. *Sambs*, 66 Wis. 2d at 301, 306–07.

¶ 20. Therefore, there must be evidence of something man-made and a defect in it must have diverted water for it to be considered artificial. As instructed by *Sambs*, a drainage system design is considered man-made and a flaw in the design may be considered to have caused an artificial flow. But there must be a record of it.

¶ 21. Here, there is no record of any man-made drainage system design. There is only a record of Wisconsin Avenue having a higher elevation than Michigan Avenue such that water flowing from an alley diverted to the east and onto the sidewalk in front of the Hansens' residence.

¶ 22. This brings us to the Grubers' second contention. They appear to seize upon the following language in *Sambs*, which states:

381

> The rule with regard to the improper drainage of runoff water forming ice has been stated to be that there is a duty to provide proper drainage where it is known to the public authority that a dangerous condition exists. In this case there is evidence that the city had notice that its failure to provide an adequate drainage system created a hazardous situation, and, therefore, it had a duty to remedy the defect.

*Id.* at 306 (citation omitted). At oral argument, the Grubers argued that *Sambs* stands for the proposition that if a municipality knows of a dangerous condition caused by an abnormally high flow of water, it is duty bound to provide a proper drainage remedy. In other words, if the Village knows that the topography within its borders has various elevations and water flow resulting therefrom creates a hazardous water flow, the Village has a duty to fix the problem.

¶ 23. We do not agree that the quotation in *Sambs* creates the duty asserted by the Grubers. In the very next sentence after the above-cited quote, the *Sambs* court wrote: "Also, because of such notice the city had a duty to inspect the system *it provided* for *its continued adequacy* and to prevent blockages and obstructions having the same result." *Id.* at 306–07. This sentence tells us that if a man-made drainage design is in place, then the city has a duty to maintain it. But if there is no design—if it is just streets and alleyways and topography—then the rule in *Corpon* controls. The rule is that when structures are built in the usual and ordinary way and not for the purpose of accumulating and discharging water on a public sidewalk, then drainage which incidentally results and is not caused by negligent maintenance is deemed natural. Thus, an essential piece of the puzzle is missing. The Grubers

had to provide evidence that not only was there water flow occasioned by certain elevations and pitches in the Village's streets, but that the Village paved these streets as part of a drainage system design plan. They did not provide this essential piece.

¶ 24. Thus, we hold, as a matter of law, that the flow of water and the formation of ice were natural. The Village is not required to create a drainage system capable of removing all water from the alleyway and appurtenant sidewalks. Every highway, every parking lot, and every alleyway involves some grading or change in the natural state of the earth. Grading, by itself, does not equal a drainage design system. To be actionable, the grading must be part of a drainage design plan or the grading must be shown to divert water from other sources onto the sidewalks. If not, the grading, by itself, does not create an artificial condition on the land even if the Village had notice that a hazardous condition existed. The condition was created by natural conditions and, according to the statute, the Village then had three weeks to address the problem.

¶ 25. The Grubers contend that even if the condition was natural, the Village let the problem linger for more than three weeks and the Village should not be afforded the immunity of Wis. Stat. § 81.15. In particular, the Grubers allege that the trial court found that the actual identical ice itself must have existed for three weeks rather than deciding whether an icy "condition" lasted for three weeks. The Grubers concede that the Hansens cleaned up the ice on a daily basis, but contend that the predicament existed throughout the winter and thus the icy condition was a seasonal problem lasting more than three weeks.

¶ 26. First, the trial court never made the distinction between "identical ice" and "icy conditions" as claimed by the Grubers. In fact, all the court said about the three-week rule was that the Village was "entitled to have the three-week notice of immunity under the statute." There is good reason why the court never addressed the distinction the Grubers now make. The Grubers never raised the three-week issue before the trial court. We thus hold that this issue is waived.

¶ 27. Although this court engages in summary judgment review de novo, we nonetheless may apply waiver to arguments presented for the first time on appeal. *See, e.g., Hopper v. City of Madison*, 79 Wis. 2d 120, 137, 256 N.W.2d 139 (1977). Application of the waiver rule is appropriate where a waived argument could have been rebutted with factual information. This is especially appropriate here. Hansen gave a written statement which is part of the record in which she said: "This winter we went out and cleared the walk by chopping and sanding and salting every morning, including the morning Laurie Gruber fell on it." That is the extent of the record about how long the "condition" continually existed. There is no mention of whether the condition lasted for one week, three weeks or the whole winter. The record appears to suggest that the water flowed due to a thaw, but we do not know when the thawing began. If the Grubers had raised the issue, the Village could have developed a record. And the Grubers could have developed a better record. And had the Grubers raised this issue with any prominence to the trial court, the trial court could have addressed it. This did not occur. We are loath to reverse a trial court on an issue that the trial court never had the opportunity to address. Because of the sparse record that we

have on the issue and because the Grubers never made an issue of it until now, the waiver rule is appropriately applied here.

*By the Court.*—Judgment affirmed.