STATE of Wisconsin, Plaintiff-Respondent,

v.

Timothy Bernard WILKS,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 83–737–CR. Argued October 3, 1984.—
Decided November 27, 1984.*

(Also reported in 358 N.W.2d 273.)

94

For the defendant-appellant-petitioner there were briefs by *Margaret A. Maroney* and *Richard D. Martin*, assistant state public defenders, and oral argument by *Ms. Maroney*.

For the plaintiff-respondent the cause was argued by *Daniel J. O'Brien*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

Amicus curiae brief was filed by *Michael J. Lund* and *Frisch, Dudek and Slattery, Ltd.*, Milwaukee, for Wisconsin Civil Liberties Foundation.

WILLIAM G. CALLOW, J.   This is a review of a decision[1] of the court of appeals affirming judgments of conviction for attempted robbery and attempted burglary entered by the Milwaukee county circuit court, Judge Robert W. Landry. We affirm the decision of the court of appeals.

The issues presented are whether a person lawfully held in police custody for a civil violation may be compelled to participate in a lineup on unrelated criminal charges and whether a city of Milwaukee ordinance,

---

[1] *State v. Wilks*, 117 Wis. 2d 495, 345 N.W.2d 498 (Ct. App. 1984).

which prohibits loitering or prowling, is unconstitutionally vague or violative of the fourth amendment to the United States Constitution or art. I, sec. 11, of the Wisconsin Constitution.

At 4:15 a.m. on August 29, 1981, two city of Milwaukee police officers were dispatched to investigate an entry in progress at 4007 North 25th Street, Milwaukee. The officers turned off the headlights on their squad car as they responded to the call. They observed Timothy Wilks standing near the corner of the building at 4007 North 25th Street. Wilks then ran south in the crosswalk across Capitol Drive, passing 15 to 20 feet in front of the squad car. The officers stopped Wilks and asked him his name and address. He answered these questions truthfully. Wilks was then asked what he was doing in the area. He first stated that he was coming home from the bars and then stated that he was just out walking around. One of the officers told Wilks he remembered him from a previous incident where he had been arrested for breaking into a house and raping a woman. Wilks denied that incident and blurted out that he had not committed any burglaries. The officers advised Wilks of the inconsistencies in his story and arrested him for violating Milwaukee Ordinance sec. 106–31(1)(a) (1981) which prohibits loitering or prowling.

Sometime[2] after his arrest, Wilks was required to participate in a lineup which involved criminal offenses unrelated to the civil offense which was the basis of his original arrest. As a result of the lineup, Wilks was identified by two women. Alice Ness identified Wilks as the man she found standing in her kitchen without her permission on August 20, 1981. She also identified him

---

[2] The record does not disclose the exact date of the lineup. The motion to suppress the eyewitness identification testimony filed by Wilks' attorney stated the lineup was conducted on August 30, 1981, at 2:45 p.m. This would have been the afternoon of the day following Wilks' arrest.

as the man she saw on her front porch on August 25, 1981. After the man left, Ness discovered that a board which secured the screen to the door had been loosened. As a result of these incidents, Wilks was charged with criminal trespass to a dwelling[3] and attempted burglary.[4]

Evelyn Sandberg identified Wilks as the man she found on her front porch on August 26, 1981. Sandberg stated she asked the man what he wanted, and he responded, "I want your money." When she replied she had no money, the man kicked in the screen door and grabbed her blouse. Sandberg screamed, and the man fled. As a result of this incident, Wilks was charged with attempted robbery[5] as an habitual criminal.[6]

Wilks moved to suppress the identifications resulting from the lineup on the grounds that there was no probable cause for his initial arrest and that, because his initial arrest had been for a civil violation, it was improper to compel him to participate in a criminal lineup. The trial court denied the suppression motion, concluding that the arrest for the ordinance violation was proper and that it was also proper to subject Wilks to the lineup. The trial court likened the compelled participation in the lineup to a situation where a motorist is stopped for a traffic violation, and as a result of the lawful stop, officers may conduct a search of the vehicle or its occupants. The trial court stated that participation in a lineup is a "realistic imposition" on a citizen who has been placed under arrest. Wilks subsequently pled guilty to attempted robbery and attempted burglary. A judgment of conviction was entered on December 14, 1982.

On appeal, Wilks argued that he was denied his constitutional right to be free from unreasonable seizure

---

[3] Section 943.14, Stats.
[4] Sections 943.10(1)(a) and 939.32, Stats.
[5] Sections 943.32(1)(a) and 939.32, Stats.
[6] Section 939.62, Stats.

when he was forced to participate in a lineup following his arrest for the ordinance violation. He also argued that the Milwaukee loitering ordinance was unconstitutionally vague and violated the fourth amendment of the United States Constitution and art. I, sec. 11, of the Wisconsin Constitution by authorizing unreasonable seizures. The constitutional challenges to the loitering ordinance had not been raised in the trial court.

The court of appeals affirmed the judgments of conviction. The court concluded there had been probable cause to arrest Wilks on the ordinance violation and that an individual in lawful custody for a civil violation may be required to submit to a lineup for an unrelated criminal offense. 117 Wis. 2d at 504–05. The court of appeals said that Wilks lacked standing to challenge the loitering ordinance on vagueness grounds because Wilks' conduct at the time of his arrest clearly fell within the "hard core" of the ordinance's proscriptions. 117 Wis. 2d at 505. The court also found that the ordinance did not authorize unreasonable seizure by allowing officers to arrest an individual without probable cause that he violated the ordinance. *Id.* at 507. Wilks petitioned this court to review the court of appeals' decision, and we granted the petition.

The first issue we decide is whether a person lawfully held in police custody for a civil violation may be compelled to participate in a lineup on unrelated criminal charges. The fourth amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Wilks contends that forcing him to participate in a lineup violated his right to be free from unreasonable seizure and that the identification evidence derived from the lineup must be suppressed because it constituted the fruit of an unreasonable seizure.

The right to be free from improper search and seizure applies with equal force to those who are civilly arrested as to those who are criminally arrested since the immediate impact on the individual is the same in both cases. *State ex rel. White v. Simpson,* 28 Wis. 2d 590, 596, 137 N.W.2d 391 (1965). For purposes of this portion of his argument, Wilks concedes that he was lawfully in custody for the ordinance violation, and he does not argue that his initial arrest was an improper seizure. Rather, he contends that the scope of the initially lawful seizure became unreasonable when, during the course of his custody for a civil violation, he was compelled to stand in a lineup on unrelated criminal charges.

The central inquiry under the fourth amendment is the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. *Terry v. Ohio,* 392 U.S. 1, 19 (1968). In order to assess the reasonableness of a particular seizure, it is necessary to balance the need for the seizure against the invasion which the seizure entails. *Id.* at 20–21. In conducting this balancing test, the individual's fourth amendment interest must be weighed against the legitimate governmental interests which will be promoted by the intrusion. *Delaware v. Prouse,* 440 U.S. 648, 654 (1979). A seizure that is reasonable at its inception may later become unreasonable in scope, and in determining the question of reasonableness, reviewing courts must decide whether the seizure was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry,* 392 U.S. at 19–20.

The governmental interest at stake in compelling individuals to participate in lineups is identifying perpetrators of crimes. A properly conducted lineup is an

effective way of securing an accurate identification. Note, *Fourth Amendment Implications of Compelling an Individual to Appear in a Lineup Without Probable Cause to Arrest,* 45 Fordham L. Rev. 124 (1976). The individual's interest at stake is his or her personal liberty and expectation of privacy. A lineup is an intrusion upon personal liberty, *In Re Melvin,* 546 F.2d 1, 5 (1st Cir. 1976), which carries with it the danger of misidentification. *United States v. Allen,* 408 F.2d 1287, 1288 (D.C. Cir. 1969). In determining the reasonableness of compelling an individual to participate in a lineup, the state's interest in identifying persons who have committed crimes must be weighed against the individual's interest in liberty and expected privacy.

Courts have held that, before a person who is at liberty may be compelled to participate in a lineup, there must be probable cause to believe that the individual committed the offense under investigation. *In Re Armed Robbery,* 99 Wash. 2d 106, 112, 659 P.2d 1092 (1983). "[W]e must be concerned . . . for the right of ordinary citizens who are not accused or suspected of any crime and who are asked to give several hours of their time to participate in a lineup, to choose freely whether or not they desire to participate." *Butcher v. Rizzo,* 317 F. Supp. 899, 903 (E.D. Pa. 1970). On the other hand, courts have held that a person lawfully in custody on a criminal charge may be required to participate in a lineup on an unrelated criminal charge. *See, e.g., People v. Hodge,* 186 Colo. 189, 526 P.2d 309 (1974) (defendant who was in custody as a suspect in a robbery was placed in a lineup on another unrelated robbery); *People v. Hall,* 396 Mich. 650, 242 N.W.2d 377 (1976) (defendant in custody on one charge was required to participate in lineup on felony murder). "[C]ourts have generally found no fourth amendment violation where a suspect incarcerated on another charge is ordered into a lineup

for a crime for which there is no probable cause to arrest him, because the procedure requires no detention without probable cause." Note, 45 Fordham L. Rev. at 126.

The instant case conforms to neither of the two situations described above since Wilks does not claim he was unlawfully in custody for a civil violation at the time he was compelled to stand in a lineup for unrelated criminal charges. No reported cases have heretofore addressed this issue. In resolving the issue, it is helpful to consider the court's reasoning in those cases which have upheld compelled participation in lineups for individuals already in custody on criminal charges. In *United States v. Anderson*, 352 F. Supp. 33 (D.C. D.C. 1972), *aff'd.*, 490 F.2d 785 (D.C. Cir. 1974), the defendant was lawfully in custody for assault with intent to commit robbery while armed at the time he was placed in a lineup on another unrelated robbery charge. The court held that no court order was required before he could be viewed in a lineup. The court stated:

"[W]hen there exists probable cause to detain the suspect and to deprive him of his liberty, he can be viewed by witnesses to other offenses without condition, since such a viewing involves no additional infringement on his liberty. . . . The matter of placing one in a lineup when he is already in detention—whether temporarily under arrest or confined under a long sentence in prison —is not the same as arresting a suspect off the street or from his home. The former is not being deprived of his liberty when placed in a lineup." 352 F. Supp. at 36.

In *Rigney v. Hendrick*, 355 F.2d 710 (3d Cir. 1965), *cert. denied*, 384 U.S. 975 (1966), the defendants were confined to jail pending trial for burglary and other offenses for failure to post bail at the time they were placed in a lineup for burglary and rape. The defendants contended they could not be forced to participate in a lineup for crimes unrelated to those for which they were in custody unless they had first been arrested for the additional crimes. The third circuit disagreed:

"The right of the police to investigate unsolved crimes cannot be denied. The scope of investigative measures used by the police necessarily includes identification of the suspected perpetrator by the victim or witnesses. In most cases this is the most positive method of solution. . . . The lineup, however, is not the only means of ·identifying a suspect; an individual not in custody may be placed under surveillance—he may be viewed on the streets, entering or leaving his home or place of business, at places of amusement, or at any other place where he is not entitled to privacy. . . . There is no law or decision which says that a man, free or incarcerated, has a constitutional right not to be observed and possibly identified as the perpetrator of a crime even though no formal charges have been made.

"   . . . .

"The contention made by the appellants that there first must be an arrest before they are taken from their cells to be placed in a lineup has no merit, for the sole physical attribute of an arrest is the taking into custody. Here, it would be anomalous to require an arrest, for the appellants are already in custody." *Id.* at 712–13 (citations omitted).

While both *Anderson* and *Rigney* involved individuals who were in custody for prior criminal charges at the time they were placed in a lineup, the courts in both cases focused on the fact that, because the defendants were already lawfully detained, requiring them to participate in lineups did not constitute a further deprivation of their liberty. *See also People v. Hodge, supra.* "We see no difficulty in holding that a person properly detained can be exhibited in a line-up." 186 Colo. at 191.

In balancing the interests of the state and the individual under the fourth amendment, it is also helpful to consider the privacy interest held by a person in lawful police custody. Once a person has been placed in valid custody, he may be fingerprinted or photographed, and those fingerprints or photographs may be used in the investigation of other crimes. Other courts have found

no distinction between the use of photographs and the use of lineups as a means of identifying perpetrators of crimes. *See, e.g., United States v. Anderson,* 352 F. Supp. at 37.

In addition, courts and commentators alike have stated that a person's expectation of privacy in his or her voice, handwriting, and physical appearance is minimal. In *Katz v. United States,* 389 U.S. 347 (1967), the Supreme Court stated that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id.* at 351.

In *United States v. Dionisio,* 410 U.S. 1 (1973), the Supreme Court considered the issue whether a grand jury's directive that subpoenaed persons furnish voice exemplars violated the fourth amendment. The Court concluded it did not.

"In *Katz v. United States, supra,* we said that the Fourth Amendment provides no protection for what 'a person knowingly exposes to the public, even in his own home or office. . . .' 389 U.S., at 351. The physical characteristics of a person's voice, its tone and manner, . . . are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." *Id.* at 14.

In *State v. Doe,* 78 Wis. 2d 161, 254 N.W.2d 210 (1977), this court upheld an order requiring a witness at a John Doe hearing to provide handwriting exemplars, stating, "[t]he amalgam of the holdings of the Supreme Court . . . is . . . that a witness may be compelled to produce exemplars not only of his handwriting and voice, but, in addition, his fingerprints or other nonintrusive or nondegrading physical manifestations or characteristics which are generally open to public view." *Id.* at 170.

This court has long held that a person cannot harbor any great expectation of privacy in his physical appearance. In *Thornton v. State*, 117 Wis. 338, 93 N.W. 1107 (1903), a defendant in custody on a rape charge was ordered to turn over his shoe so that it could be compared with a footprint left at the scene of the crime. This court upheld the order, saying:

"[T]he personal appearance of one, his obvious physical characteristics and his attire, are things usually open to observation by others, and from time immemorial testimony by those who have observed them has been received and has been considered in no wise to invade the privacy of the person observed. . . . That a man's head is bald is a fact ordinarily observed and known by many who come in contact with him. Does it not thereby cease to be one of those private, secret facts which it is an invasion of his right to have observed against his will? May he not, when in custody, be required to remove his hat and thus give the opportunity of observation which has commonly existed for those coming in contact with him? It seems that this must be so." *Id.* at 342–43.

It is also helpful in conducting the balancing test of the state's and the individual's interests to consider the degree and extensiveness of the governmental intrusion into a person's zone of privacy. Courts have held that extreme intrusions will not be allowed into the personal privacy of individuals arrested for civil violations. In *Tinetti v. Wittke*, 479 F. Supp. 486 (E.D. Wis. 1979), *aff'd.*, 620 F.2d 160 (7th Cir. 1980), the district court held that persons arrested for misdemeanor traffic violations could not be subjected to strip searches unless there was probable cause to believe the offender was concealing weapons or contraband on his body. The court focused on the extreme intrusiveness of strip searches, stating, "[w]hile the total time involved in a strip search is minimal, the humiliation and embarrassment experi-

enced by the offender are much more long lasting." *Id.* at 489. Similarly, courts have been reluctant to allow police intrusions into the privacy of individuals' homes absent a valid warrant. *See, e.g., Welsh v. Wisconsin,* 104 S. Ct. 2091 (1984).

While compelling a person held in custody for a civil offense to participate in a lineup may be a greater intrusion into the individual's privacy than subjecting him or her to fingerprinting or photographing, lineups are clearly less intrusive than either strip searches or warrantless entries into homes. Further, the expectation of privacy in a person's physical appearance is minimal since no one can reasonably expect that his or her physical characteristics will remain a secret. Finally, requiring someone who is already in custody to stand in a lineup involves no additional deprivation of the person's liberty.

The state has a valid interest in identifying perpetrators of crimes. Incarcerated individuals have an interest in their personal liberty and expectation of privacy. On balance, however, we conclude in this case that the state's interest outweighs that of the individual. There is no question but that if Wilks had been in custody for a criminal offense, he could have been required to stand in a lineup for another unrelated criminal charge. We see no distinction between a criminal and a civil arrest for purposes of requiring the incarcerated person to participate in a lineup. Since the person is already in custody, no additional deprivation of liberty is involved. A person who has been placed under valid detention does not have the same expectation of privacy as a person at liberty. The reasonable expectation of privacy in concealing one's physical appearance is small. Consequently, we hold that a person who is lawfully in custody for a civil offense may be required to participate in a lineup for an unrelated criminal offense.

Wilks also argues that the Milwaukee loitering ordinance upon which he was initially arrested is unconstitutionally vague and authorizes unreasonable seizure by allowing officers to make arrests without probable cause that the ordinance had been violated. This issue was raised for the first time on appeal. Consideration of a constitutional issue raised for the first time on appeal is discretionary with this court. *In Interest of Baby Girl K.*, 113 Wis. 2d 429, 448, 335 N.W.2d 846 (1983). "This court has consistently held that it will not entertain a constitutional issue raised for the first time on appeal unless there [are] some compelling reasons for doing so." *Sambs v. Brookfield,* 66 Wis. 2d 296, 314, 224 N.W.2d 582 (1975). Because Wilks failed to raise the constitutional challenges to the loitering ordinance in the trial court and because we do not on the record before us find a compelling reason for doing so, we do not address that issue.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). I dissent from the majority opinion which holds that it is constitutionally permissible for law enforcement officers to compel a person under arrest for violation of a civil municipal ordinance[1] to participate in a lineup in a criminal investigation when the crime is unrelated to the civil arrest and when there is neither probable cause to believe nor reasonable suspicion that the civil arrestee committed the crime. Accordingly I would suppress the

---

[1] Sound public policy favors the use of appearance tickets for civil offenders, not arrest, unless the circumstances require arrest to protect the public or to ensure appearance. See, *e.g.,* Mendelson, *Arrest for Minor Traffic Offenses,* 19 Cr. L. Bull. 501 (1983). See also *State v. Welsh,* 108 Wis. 2d 319, 343–345, 321 N.W.2d 245 (1982).

identification evidence obtained from the lineup. Other identifications based on independent sources might be admissible at trial. *United States v. Crew,* 445 U.S. 463 (1980).

If there were probable cause to believe that the civil arrestee committed the crime for which the lineup is held, I would conclude that the civil arrestee could be compelled to participate in a lineup investigating that charge.[2] If the court were to conclude that a civil ar-

---

[2] The fourth amendment probable cause requirement is the best compromise that has been found to accommodate the opposing interests of safeguarding citizens from unreasonable interferences with privacy and giving "fair leeway for enforcing the law in the community's protection." 1 LaFave, *Search and Seizure,* sec. 3.2(a), p. 450 (1978).

In *Delaware v. Prouse,* 440 U.S. 648, 654 (1979), the court said that to determine the reasonableness of a less-than-arrest seizure (here the lineup) it is necessary that the "facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test."

The "objective standard" of probable cause to believe the person committed a crime or a less stringent test is not met in this case. The state does not contend that the officers' conduct was justified on the ground that the officers had probable cause to believe or had reasonable suspicion that the defendant was involved in the crime investigated by the lineup.

The majority opinion ignores the need for an objective standard and without explanation, treats the civil arrestee like the criminal arrestee. The "objective standard" of probable cause that a person committed a crime is what distinguishes the civil arrestee from the criminal arrestee. Probable cause to believe that the defendant violated a civil ordinance is not the same as probable cause to believe or reasonable suspicion that the defendant committed a crime. In *Welsh v. Wisconsin,* —— U.S. ——, 104 S. Ct. 2091 (1984), the Supreme Court concluded that the civil nature of the offense limits the intrusions law enforcement officers are permitted to make.

If police are allowed to compel a civil arrestee to participate in a lineup without probable cause to believe that the civil arrestee committed a crime, the police are in effect permitted to circum-

restee may be compelled to participate in a lineup when there is merely reasonable suspicion to believe that the civil arrestee committed the crime for which the lineup will be held, the court would, I believe, have to assure the civil arrestee protections, such as requiring a judicial order and the right to counsel at the lineup.[3]

Civil arrestees are not shorn of all reasonable expectations of privacy. The fourth and fourteenth amendments

vent the probable cause requirement for arrest for a crime. There is a temptation for officers to make subterfuge civil arrests in order to subject the arrestee to a lineup. Cf. 2 LaFave, *Search and Seizure*, sec. 5.3(b) at 320 (1978).

[3] In this case there is no finding of probable cause or reasonable suspicion. If the "reasonable suspicion" approach is taken— and the constitutionality of such an approach is problematic— then at a minimum the protective conditions recommended by the American Law Institute should be adopted. In its Model Code of Pre-Arraignment Procedures the ALI proposes that a judge must issue an order requiring a person at liberty to appear for nontestimonial identification and that the following conditions be met: (1) reasonable cause exists to believe the described offense has been committed; (2) reasonable grounds exist to suspect that the person named in the order committed the offense and that in view of the seriousness of the offense, it is reasonable to subject the person to the described identification procedures; (3) the results of the specific identification procedures will be of material aid in determining the identity of the offender; and (4) the evidence cannot practicably be otherwise obtained. Sec. 170.2(6). See also Comment, *Detention for Taking Physical Evidence Without Probable Cause*, 14 Ariz. L. Rev. 132 (1972); Note, *Detention to Obtain Physical Evidence Without Probable Cause: Proposed Rule 41.4 of the Federal Rules of Criminal Procedure*, 72 Colum. L. Rev. 712 (1972); Note, *Fourth Amendment Implications of Compelling an Individual to Appear in a Lineup Without Probable Cause to Arrest*, 45 Ford. L. Rev. 124 (1976); Note, *Constitutional Law—Search and Seizure—Temporary Detention for Lineup Identification with Less than Probable Cause Permissible under the Fourth Amendment*, 18 Wayne L. Rev. 827 (1972); Pridgen, *Fourth Amendment Aspects of Compelling Identification*, Search & Seizure Law Report, Vol. 4, No. 11 (Nov. 1977), p. 4.

are involved in this case because compelling a person (even one under arrest) to participate in a lineup constitutes a seizure (albeit a seizure less intrusive than the arrest) within the meaning of the constitution. The purpose of the fourth amendment is to impose a standard of reasonableness upon law enforcement officers in order to safeguard an individual's privacy and security against arbitrary invasions by law enforcement officers. *Terry v. Ohio,* 392 U.S. 1, 19 (1968) ; *Delaware v. Prouse,* 440 U.S. 648, 654 (1979) ; *Brown v. Texas,* 443 U.S. 47, 50–51 (1979).

The reasonableness of compelling a civil arrestee's participation in a lineup is judged by balancing the intrusion on the constitutionally protected individual interests against the promotion of legitimate governmental interests. The court weighs the severity of the interference with individual liberty, the gravity of the public concerns served by the seizure, and the extent to which the seizure advances the public interest. *Brown v. Texas,* 443 U.S. 47, 50–51 (1979).

The state contends that law enforcement officers should have unlimited discretion to compel any civil arrestee to participate in a lineup. The state asserts that this practice is reasonable under the fourth amendment because the state's interest in using the lineup as a means of solving crime outweighs the intrusion involved.

The individual interests to be protected from compelled participation in a lineup include the individual's right to privacy, the individual's control over information about herself or himself, and the individual's ability to decide the use of her or his time. The individual's interests also include the right to personal security free from arbitrary interference by law enforcement officers, including the individual's right to be left alone and the individual's right to be free from being thrust into a criminal atmosphere associated with a lineup. Furthermore the indi-

vidual has an interest in her or his dignity. Finally the individual has an interest in not being subjected to the stigma of a lineup and the significant risk of a false identification inherent in any lineup.[4]

While individuals have no legitimate expectation of privacy in their appearance, they do have a legitimate expectation not to be placed in a lineup. Society recognizes this expectation for persons at liberty who are not under arrest by not allowing law enforcement officers to compel individuals to participate in lineups.

Since the defendant in this case was under arrest, compelling him to participate in a lineup at the police station does not detain him or interfere with his personal liberty to the same extent that such compulsion would intrude on a person at liberty. Nevertheless compelling a civil arrestee to participate in a lineup does interfere with certain aspects of that person's right to privacy and personal security.

Although apparently there is authority that civil arrestees may be photographed and fingerprinted, these practices are less intrusive and less offensive than the lineup. They involve less stigma and less offense to the person's dignity. Unlike photographs and fingerprints, lineups may be time consuming and may be performed repeatedly. Furthermore lineups subject the civil arrestee to observation by members of the public, to the stigma of involvement in the criminal justice system, and to the possible abuse of an improper lineup.

Even if the lineup is viewed as a minimal intrusion on the personal rights of the civil arrestee—at least when compared to a similar intrusion on a person at liberty—the balancing test requires a determination of whether

---

[4] See, *e.g.*, Yarmey, *Eyewitness Identification: Psychological Aspects*, and Marcus, *Eyewitness Identification: Constitutional Aspects*, in 2 ENCY. OF CRIME AND JUSTICE 749, 755 (1983); Sobel, *Eye-Witness Identification: Legal and Practical Problems*, secs. 3–3.02 (1972) (1984 Supp).

this intrusion outweighs the governmental interest or is outweighed by it.

The legitimate governmental interests promoted by compelling an individual to participate in a lineup is the identification of perpetrators of unsolved crimes, the detection of crime and the prevention of crime.

The state has a legitimate interest and need to investigate unsolved crimes, and the lineup is a useful tool by which victims and witnesses may identify offenders. The question remains, however, whether compelling a civil arrestee to participate in a lineup under the circumstances of this case sufficiently furthers the legitimate governmental interest in identifying perpetrators of unsolved crime to justify the intrusion on the civil arrestee. As the United States Supreme Court observed, the court must determine whether the law enforcement practice "is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests . . . ." *Delaware v. Prouse, supra,* 440 U.S. at 659. Stated another way, the question is whether there is a rational relationship between compelling a civil arrestee under the circumstances of this case to participate in a lineup and detecting perpetrators of crime. On the basis of this record, the answer is no.

The state does not argue that the law enforcement officers had a reasonable suspicion that the defendant participated in the crime under investigation or that the defendant's identifying characteristics would be of value in the lineup. The state did not show a need for, or the possible fruitfulness of, identification through the lineup used in this case.

Since in this case there is no probable cause to believe or reasonable suspicion that the defendant committed a crime in this case and since the civil offense is not related to the crime under investigation, there is insufficient basis upon which to conclude that compelling the defendant to participate in a lineup is a sufficiently pro-

ductive mechanism to justify the intrusion. The state has brought forth no evidence, no case law and no empirical data to support the premise that apparently underlies its position. The premise appears to be that civil violators (a category which includes certain traffic offenders and violators of civil ordinances, persons in arrears for child support or sued for paternity, as well as "loiterers") are persons apt to commit crimes and that therefore their participation in a lineup is needed for crime detection and prevention. Without evidence that shows any relationship between civil arrestees and perpetrators of crime, it is unreasonable to conclude that civil arrestees are any more likely to be perpetrators of crime than the general public. Accordingly, it is unreasonable to compel their participation in a lineup for criminal charges. Such compulsion would be insufficiently productive of information for crime detection to justify the intrusion on the individual as a reasonable law enforcement practice.

In sum, prohibiting the state from compelling a civil arrestee to participate in a lineup will not harm the state's interest in the investigation of crime. It is apparent that the state could use less intrusive means than compelling all civil arrestees to participate in lineups to further the state's interest of investigating unsolved crimes. Identification of the offender might have been made from photographs and fingerprints. Furthermore, since the civil arrestee's name and address are known to the law enforcement officers, the civil arrestee will be available for an ongoing investigation.

I conclude that when law enforcement officers seek to compel a civil arrestee to participate in an identification procedure for purposes of a criminal investigation and there is no probable cause to believe or reasonable suspicion that the civil arrestee committed the crime, the state must show a need for the procedure before undertaking it. Compare 3 LaFave, *Search and Seizure*, sec.

9.6, p. 160 (1978). If nothing more connects the individual with a crime than the individual's incarceration in a civil forfeiture action, the balance tips in favor of the individual's privacy rights and the right to be free from the unreliability of a lineup.

The analysis and conclusion that I have set forth comports with the decision in *Tinetti v. Wittke,* 479 F. Supp 486 (E.D. Wis. 1979), aff'd. 620 F.2d 160 (7th Cir. 1980). In *Tinetti,* the civil arrestee, a traffic violator, was strip searched. The governmental interest in undertaking the search was to discover weapons and contraband. The court found that traffic violators, unlike detainees charged with criminal offense, were incarcerated solely due to their inability to post cash bail and that there was no reason to believe that traffic violators will conceal weapons or contraband. The court concluded that a routine strip search of traffic violators lacked a sufficient relationship to the state's legitimate interest in discovering concealed weapons or contraband. When the court applied the balancing test, it concluded that the intrusion on the personal dignity of the civil arrestee without any relation to the likelihood of concealment of weapons or contraband was unconstitutional. Thus the *Tinetti* court enjoined law enforcement officers from strip searching persons charged with traffic offenses, which are not crimes, except where the officers have probable cause to believe that contraband or weapons are being concealed on the persons of the arrestees.

The *Tinetti* case is apposite. In this case, as in *Tinetti,* the individual was arrested for a civil ordinance violation. In both cases there was no probable cause to believe or reasonable suspicion that the individual was involved in a crime. In both cases the police originally exercised dominion over the liberty of the civil arrestee solely to ensure bail for the civil action. According to the *Tinetti* decision, when a person is under civil arrest, there must be a rational relationship between the subse-

quent intrusion and the governmental interest. In this case the intrusion was less offensive than in *Tinetti,* but in this case, as in *Tinetti,* there was no rational relationship between the intrusion and the governmental interest. Furthermore, in this case, in contrast to *Tinetti,* there were less intrusive means available to accomplish the governmental interests.

Since I would decide this case on the basis that a civil arrestee may not be compelled to participate in a lineup when the crime is unrelated to the civil arrest and when there is neither probable cause to believe nor reasonable suspicion that the civil arrestee committed the crime, I do not reach the question of the constitutionality of the loitering ordinance. I am, however, uncomfortable with the majority's treatment of the issue given their disposition of the lineup question. The majority refuses to consider the question of the constitutionality of the Milwaukee loitering ordinance saying that the defendant waived his right to appellate review by not challenging the ordinance in the circuit court.

I agree that a claim of a violation of a constitutional right will be deemed waived unless timely raised in the circuit court and that consideration of a constitutional issue raised for the first time on appeal is discretionary with this court. See *State v. Williamson,* 84 Wis. 2d 370, 379, 267 N.W.2d 337 (1978) ; *Maclin v. State,* 92 Wis. 2d 323, 329, 284 N.W.2d 661 (1979) ; *In Interest of Baby Girl K,* 113 Wis. 2d 429, 448, 335 N.W.2d 846 (1983).

The issue, however, is the criteria the court should use to determine whether it will exercise its discretion to review a constitutional issue that was not raised in the circuit court but was briefed before this court and the court of appeals and was considered by the court of appeals.

Citing *Sambs v. Brookfield,* 66 Wis. 2d 296, 314, 224 N.W.2d 582 (1975), the majority sets forth the "compelling reason" test: "This court has consistently held that

it will not entertain a constitutional issue raised for the first time on appeal unless there [are] some compelling reasons for doing so." P. 107, *supra*. Without discussion, the majority concludes that there is no compelling reason to reach the question of the constitutionality of the ordinance and the legality of the civil arrest.

The more usual statement of the standard this court uses to determine whether it will exercise its discretion to review a constitutional issue in a criminal case is found in *Bradley v. State*, 36 Wis. 2d 345, 350, 153 N.W.2d 38, 155 N.W.2d 564 (1967): "this court may nevertheless decide a constitutional question not raised below if it appears in the interests of justice to do so and where there are no factual issues that need resolution." More recently in *Maclin v. State*, 92 Wis. 2d 323, at 329, 284 N.W.2d 661 (1979), Justice Callow writing for the court noted that "the rule stated in *Bradley* has been consistently followed by this court (citations omitted)." The *Bradley* statement of the standard was used in *Baby Girl K*, in which the court also noted cases setting forth the additional requirement that "both parties have had the opportunity to brief the issue." *Baby Girl K*, 113 Wis. 2d at 448.

Since the creation of the court of appeals this court has, in several cases, considered constitutional issues not raised in the circuit court without verbalizing, analyzing or applying the *Bradley-Baby Girl K* test.[5] The court's willingness in recent cases to consider significant constitutional issues—even though they were not raised in the

---

[5] See *e.g., State v. Gustafson*, 119 Wis. 2d 676, 693, 350 N.W.2d 653 (1984); *State v. Mosley*, 102 Wis. 2d 636, 642, 307 N.W.2d 200 (1981); *Manson v. State*, 101 Wis. 2d 413, 417–418 n. 2, 304 N.W.2d 729 (1981); *State v. Baldwin*, 101 Wis. 2d 441, 446, 304 N.W.2d 742 (1981); *State v. Wedgeworth*, 100 Wis. 2d 514, 528–529, 302 N.W.2d 810 (1981). Compare the court's careful analysis in exercising its discretion to review in *Maclin v. State, supra*, 92 Wis. 2d at 328–31.

circuit court or were improperly raised—apparently comports with the court's emphasis, since the creation of the court of appeals, on the law development function of this court. As Chief Justice Heffernan has explained, "it is hardly in the interest of the law-declaring function of this court if matters of serious public concern which are likely to cause judicial disputes in the future are not resolved when a factual basis on which a judicial declaration may be made to guide future conduct is presently before the court." *State ex rel. La Crosse Tribune v. Circuit Court,* 115 Wis. 2d 220, 228–229, 340 N.W.2d 460 (1983). Accordingly in *State v. Walsted,* 119 Wis. 2d 483, 488, 490, 351 N.W.2d 469 (1984), the court decided the merits of the constitutional issue posed by defendant's motion and refused to decide or consider a party's arguments that the defendant's motion was not timely.

In order for the litigants to know whether to brief and argue the merits of the constitutional issue itself or the merits of the effectiveness of the waiver of the constitutional issue, the petitions for review and the responses should address this issue and this court in drafting its orders granting review should take care to set forth the issue it will consider. We should also take greater care in our opinions to explain and apply the criteria we use in determining why we do or do not exercise our discretion in that case to review the constitutional issue.

For the reasons set forth, I dissent.

I am authorized to state that JUSTICE WILLIAM A. BABLITCH joins this dissent.