Miguel GONZALEZ, Sr., Esperanza Gonzalez and Miguel Gonzalez, Jr., by his Guardian ad Litem, Robert H. Bichler, Plaintiffs-Respondents and Cross-Appellants-Petitioners,

v.

The CITY OF FRANKLIN, a municipal corporation, and The Home Indemnity Company, an insurance corporation, Defendants-Appellants and Cross-Respondents and Cross-Petitioners.

Supreme Court

*No. 84–1733. Argued March 2, 1987.—Decided April 10, 1987.*

(Also reported in 403 N.W.2d 747.)

For the plaintiffs-respondents and cross-appellants-petitioners there were briefs by *Robert H. Bichler* and *Thompson & Coates, Ltd.,* Racine, and oral argument by *Robert H. Bichler.*

For the defendants-appellant and cross-respondents and cross-petitioners there were briefs by *Rocke A. Calvelli, Douglas H. Starck* and *Prosser, Wiedabach & Quale, S.C.,* Milwaukee, and oral argument by *Rocke A. Calvelli* and *Douglas H. Starck.*

LOUIS J. CECI, J. This is a review of a decision of the court of appeals, *Gonzalez v. City of Franklin,* 128 Wis. 2d 485, 383 N.W.2d 907 (Ct. App. 1986), which reversed, in part, a judgment of the circuit court for Racine county, Karl Peplau, Reserve Judge, awarding

$500,000 in damages to members of the Gonzalez family. The trial court judgment was entered against the city of Franklin and its insurer, The Home Indemnity Company. The appeals court reduced the $500,000 award, holding that recovery was limited by sec. 893.80(3), Stats.,[1] to $50,000 per plaintiff. The appellate court further held that the city of Franklin (City) had not waived the statutorily imposed municipal liability limit of $50,000 simply by contracting with The Home Indemnity Company (Home Indemnity) for insurance coverage in excess of the statutory limit. The plaintiffs in the trial court (Miguel Gonzalez, Sr., Esperanza Gonzalez, and Miguel Gonzalez, Jr. by his guardian ad litem, Robert H. Bichler) petitioned this court for review of the appeals court decision, which petition was granted on June 10, 1986.

Two issues are raised pursuant to the petition of the Gonzalez family (the Gonzalez):

(1) Despite the existence of a $50,000 per person statutory cap of municipal liability protecting the City, may the Gonzalez recover directly from the liability insurer, Home Indemnity, in an amount in excess of the liability limits placed on the insured, the City; and

(2) Did the City implicitly waive the $50,000 per person liability cap by contracting with Home Indemnity for insurance coverage in excess of the statutory

---

[1]That statute provides: "The amount recoverable by any person for any damages, injuries or death in any action founded on tort against any ... governmental subdivision or agency thereof and against their officers, officials, agents or employes for acts done in their official capacity or in the course of their agency or employment, whether proceeded against jointly or severally, shall not exceed $50,000. ... No punitive damages may be allowed or recoverable in any such action under this subsection."

cap, when the applicable insurance policy states that persons injured in Wisconsin will be entitled to recover "to the extent of the insurance afforded by this policy"?

The City and Home Indemnity petitioned this court for cross-review of the remainder of the appeals court decision which affirmed various evidentiary rulings of the trial court as well as the jury determination of liability, which apportioned 100 per cent of the causal negligence to the City. The petition for cross-review was also granted on June 10, 1986.

We affirm the decision of the court of appeals on both the issue dealing with direct recovery against the insurer for an amount in excess of the statutory liability limits and the waiver issue. We further affirm the appeals court's disposition of the remaining issues, each of which will be discussed in more detail below. We now turn to the facts of this case.

## I.

On August 1, 1982, the Gonzalez family went to Lions Legend Park, a park owned by the City, to celebrate Miguel, Jr.'s seventh birthday. While at the park, Miguel, Jr. found a ball-like object on the ground, which he believed to be a smoke bomb. He picked up the ball and took it home with him when his family left the park for the day. The boy hid the ball from his parents, believing that his parents would confiscate it if they knew he had it. Once home, again without his parents' knowledge, Miguel, Jr. attempted to ignite the object with matches. When that failed, he obtained a cigarette lighter from the Gonzalez home and used it to ignite the ball. By this time, Miguel, Sr. noticed what his son had done. He shouted for the

children to stay clear and reached for the ball to throw it out of the way. However, it exploded as he was reaching for it. Miguel, Sr. lost his right hand as a result of the explosion, and Miguel, Jr. suffered an open fracture of his right leg and serious burns on both his legs and body.

The explosive device had apparently been left over from a Fourth of July fireworks display sponsored by the City in Lions Legend Park. The fireworks display had been staged by Galaxy Fireworks Manufacturing Company (Galaxy) pursuant to a contract entered into between it and the City. The fireworks used at the Fourth of July celebration were provided to Galaxy, in part, by Pyro-Science Development Corporation (Pyro). Galaxy representatives, however, were in charge of actually lighting the fireworks.

After the fireworks display, Galaxy employees cleaned and checked the display area for unexploded shells. They raked the fireworks launching pad area and illuminated the area with flashlights and car headlights to aid their observation for stray shells. The Galaxy crew found nothing. Although Galaxy performed a general cleanup of the park area, they did not make any representations, either written or oral, regarding the adequacy of their cleanup efforts. Furthermore, unauthorized fireworks were shot off later that night at the park. In any event, the City conceded that it had full responsibility for the cleanup operation. The following day, a City fire department employee also inspected the area, but again no stray shells were found.

The record does not indicate with any degree of certainty whether the explosive which caused the injuries originated either with Pyro or with Galaxy.

116

The Gonzalez family brought suit[2] on March 16, 1983, against the City; the City's insurer, Home Indemnity; and Galaxy and its insurer.[3] An amended complaint additionally named Pyro as a defendant. The original complaint charged Galaxy with negligence in the preparation and the display of the fireworks program. Galaxy was also charged with negligence in its cleanup efforts after the fireworks display had ended. The City was charged with negligence in the supervision of the fireworks display and the care, supervision and maintenance of the premises both during and after the fireworks program. The claim against Home Indemnity was based upon its direct liability as an insurer to the plaintiffs under sec. 632.24, Stats.,[4] and on a clause in its liability policy which authorized recovery up to the policy amount ($500,000). In the amended complaint, Pyro was charged with negligence in the manufacture, sale, and distribution of the explosive device.

Prior to trial, *Pierringer*-type releases were executed in favor of defendants Galaxy and Pyro. A jury

---

[2]Damages were sought by both Miguel, Sr. and Miguel, Jr., as well as Miguel, Sr.'s wife, Esperanza Gonzalez.

[3]Also named as a defendant was the plaintiffs' health insurance provider, Blue Cross-Blue Shield of Florida. Pursuant to a stipulation and order for dismissal dated June 13, 1984, the health insurance provider was dismissed from the action.

[4]That section provides as follows: "*Direct action against insurer.* Any bond or policy of insurance covering liability to others for negligence makes the insurer liable, up to the amounts stated in the bond or policy, to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured."

trial was held on May 7–14, 1984. The jury, in a special verdict, found the City 100 per cent negligent for the plaintiffs' injuries and awarded $694,973.82 in damages, which included $350,000.00 for Miguel, Sr.'s future loss of earning capacity. On June 21, 1984, pursuant to motions after verdict, the trial court approved the jury determination of negligence, but reduced the recovery to conform to the $500,000 liability limit contained in the Home Indemnity policy.[5] In so holding, the trial court relied heavily upon the terms of the policy.[6] The trial court reasoned that, by virtue of the policy language, the insurer expressly agreed to be directly responsible for dam-

[5]Plaintiffs' post-verdict motion requested approval of the jury verdict, but asked that the damages award be limited to $500,000 to conform to the liability limit contained in the policy.

[6]The policy stated in applicable part: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or, B. property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

An amendment to the liability provision of the policy provided that: "When this policy is issued or delivered in the State of Wisconsin it is agreed that: ... 6. If an action for bodily injury or property damage is brought in Wisconsin, the condition entitled 'Action Against Company' is amended to read: ... 'Any person or organization or the legal representative thereof who has secured a judgment against the insured shall be entitled to recover under this policy to the extent of the insurance afforded by this policy.'"

ages up to the stated $500,000 policy limit in those cases where, as here, the injured parties obtained a judgment against the insured. The court further held that the existence of an insurance policy providing for coverage in excess of the statutory limit, in and of itself, constituted a waiver of the $50,000 limit contained in sec. 893.80(3), Stats. The trial court believed that absent an express limitation on liability, the statutory limit was waived. Further, the existence of the insurance contract served to extend the recovery limit to $500,000 per occurrence. Accordingly, the trial court ordered judgment against both the City and Home Indemnity in the amount of $500,000. The City and Home Indemnity appealed from this judgment.

On appeal, the court of appeals reversed the trial court on the limited issue of whether the existence of excess liability coverage operated to waive the $50,000 municipal liability limit contained in sec. 893.80(3). It therefore remanded the case for entry of an award of damages which conformed with the statutory limit. The appeals court believed that any inferences of the existence of a waiver were weak at best and, relying on this court's decisions in *Marshall v. Green Bay,* 18 Wis. 2d 496, 118 N.W.2d 715 (1963); *Sambs v. Brookfield,* 66 Wis. 2d 296, 224 N.W.2d 582 (1975); and *Stanhope v. Brown County,* 90 Wis. 2d 823, 280 N.W.2d 711 (1979), held that for waiver to lie, more than "a merely inferential statement of waiver" was required. 128 Wis. 2d at 492. The court stated that its interpretation of case law, especially *Sambs* and *Stanhope,* indicated to it that a waiver must be "specific or express." *Id.* at 494. Since the insurance policy made no explicit reference to governmental functions or to the desirability of a waiver, the court held that the policy language did not constitute a waiver of govern-

119

mental liability limits. It therefore limited plaintiffs' recovery to the statutory limit of $50,000. Plaintiffs petitioned this court for review of that portion of the appeals court decision which so limited the recovery.

The court of appeals also addressed the contention made by the City and Home Indemnity that the trial court had ruled incorrectly on a number of evidentiary challenges raised at trial. For example, the trial court had granted the Gonzalez' motion *in limine* which prohibited Home Indemnity from introducing evidence which would have identified Miguel, Sr. as an illegal alien.[7] The appeals court affirmed the trial court's ruling which prohibited introduction of this evidence. In addition, the court of appeals addressed a challenged trial court ruling which permitted plaintiffs to introduce into evidence, to aid in the jury's determination of, among other things, Miguel, Sr.'s loss of future earning capacity, a mortality table compiled from data reflecting the life expectancy of Caucasian male United States citizens. The appeals court rejected arguments raised by the City and Home Indemnity which challenged the admissibility of the mortality table. Finally, the appeals court rejected all other arguments regarding alleged evidentiary errors at the trial court level, including the argument that the jury verdict, apportioning 100 per cent of the causal negligence to the City, was improper and not supported by credible evidence.

We affirm the appeals court decision in all respects, both with regard to the evidentiary rulings at the trial court level and with regard to the $50,000 cap on municipal liability and waiver of governmental

---

[7]Miguel, Sr. is a Mexican alien, having entered this country illegally in 1971 to work as a migrant laborer.

immunity. We address in turn each of the issues raised by the respective parties pursuant to the petitions for review and cross-review.

## II.

The first issue we discuss deals with whether the appeals court erred in reducing the damages award to $50,000 to conform to the municipal liability statutory cap contained in sec. 893.80(3), Stats. Since the applicability of the liability limit requires interpretation of a statute, a question of law, we owe no deference to the decisions of the courts below. *DeMars v. LaPour,* 123 Wis. 2d 366, 370, 366 N.W.2d 891 (1985).

Petitioners argue that a simple examination of the policy language mandates judgment in their favor. They contend that the liability provision, including its accompanying amendment, unambiguously indicates that the maximum amount of recovery provided by Home Indemnity is $500,000. The policy amendment obligates the insurer up to the $500,000 policy limit in the event that judgment is obtained against the insured, irrespective of any cap on liability placed on the insured. Home Indemnity, in other words, obligated itself via contract to be directly responsible to any injured plaintiffs to the extent of its stated policy coverage. Absent any expressed limitation on the amount of recovery against the insurer, none being present here, Home Indemnity must be bound by the very language in the insurance policy. The policy language, petitioners argue, is not susceptible to more than one interpretation; therefore, this court must construe the policy to give effect to the parties' intent which was so plainly expressed in the insurance contract.

We begin our analysis by examining the language contained in the insurance policy. In Wisconsin, the construction of contracts of insurance should be made with an aim toward effecting the true intent of the parties and the extent of policy coverage. *Limpert v. Smith,* 56 Wis. 2d 632, 203 N.W.2d 29 (1973); *Schuhknecht v. Robers,* 192 Wis. 275, 212 N.W. 657 (1927). The test "is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood them to mean." *Ehlers v. Colonial Penn Ins. Co.,* 81 Wis. 2d 64, 74–75, 259 N.W.2d 718 (1977) (citation omitted). When a policy is clear and unambiguous on its face, the terms of that policy should not be rewritten by construction to bind an insurer to a risk it never contemplated or was willing to cover, and for which it was never paid. *Limpert,* 56 Wis. 2d at 640. However, when the terms of the policy are ambiguous or obscure, the policy must be strictly construed against the drafter of the policy, the insurance company. *Wisconsin Builders, Inc. v. General Ins. Co.,* 65 Wis. 2d 91, 103, 221 N.W.2d 832 (1974). Words or phrases in a contract are ambiguous when they are "reasonably or fairly susceptible to more than one construction." *Stanhope,* 90 Wis. 2d at 849.

The key policy provision here states that, for policies issued or delivered in Wisconsin, "Any person ... or the legal representative thereof who has secured a judgment against the insured shall be entitled to recover under this policy to the extent of the insurance afforded by this policy." Elsewhere, the policy states that the maximum liability limit shall be $500,000. Isolating only these policy provisions, it would be possible to construe the insurance contract

so as to justifiably afford an award of damages to the petitioners in an amount in excess of the $50,000 municipal liability limit. However, the policy also states that "the Company shall pay on behalf of the insured all sums which the insured shall become legally obligated to pay." We believe that, when construing these provisions together, the petitioners' proffered interpretation of the insurance contract cannot be accepted.

■

We have previously stated that "[o]ther things being equal, a construction which gives reasonable meaning to every provision of a contract is preferable to one leaving part of the language useless or meaningless." *Stanhope,* 90 Wis. 2d at 848–49. It may be true that the policy's liability provision, as petitioners argue, contains no express limitation on liability. However, we believe that such a limitation must be inferred from language elsewhere in the policy which states that the insurer shall be obligated to pay those sums which the *insured shall become legally obligated to pay.* Unless we construe the policy provisions dealing with liability coverage to comport with the municipal liability limits as set forth in sec. 893.80(3), Stats., the portion of the policy delineating the insurer's obligation to pay that sum of money which the *insured* is obligated to pay would be rendered meaningless. This court can give effect to all policy provisions by construing the insurance contract in this manner. We therefore adopt this interpretation.

In a related argument, petitioners next contend that by virtue of Wisconsin's direct action statute, sec. 632.24, Stats., an injured party is entitled to independently recover damages from the insurer irrespective of the insured's ability or lack of ability to pay. Citing

*Shannon v. Milwaukee,* 94 Wis. 2d 364, 289 N.W.2d 564 (1980), and *Rabe v. Outagamie County,* 72 Wis. 2d 492, 241 N.W.2d 428 (1976), in support, petitioners claim that the potential liability of the insurer is independent of the liability of the insured, such that a claim against the insurer could conceivably survive dismissal of any claims brought against the insured.

In *Shannon,* plaintiff brought suit against the city of Milwaukee and a city employee, charging both with negligence. The suit against the city was based upon the theory of *respondeat superior,* whereby an employer may be held vicariously liable for the torts of its employee if those torts were committed within the scope of the employment relationship. Plaintiff in *Shannon* additionally brought suit against the employer's insurer. The court in *Shannon* held that irrespective of a dismissal of the claim against the city due to procedural infirmities, the claim against the employee survived that dismissal. The reason, the court stated, was that "plaintiff's direct action against [the employee's insurer] is separate and apart from the claim disallowed by the city. It is founded not upon [plaintiff's] claim against the city, but rather, ... upon [the employee's] allegedly negligent operation of the city-owned vehicle." 94 Wis. 2d at 370–71.

*Rabe* involved a wrongful death action brought against Outagamie county and its insurer, also based upon *respondeat superior* principles. Here again, the plaintiff alleged that the county ought to be held vicariously liable for injuries caused by the negligence of its employees. Again, procedural infirmities precluded plaintiff from proceeding directly against the municipality; however, the court stated that "[s]ince the complaint alleges that the liability policy of the insurer extends to the county employees, dismissal of

the county does not also discharge the insurer who bears their liability under our direct action procedures." 72 Wis. 2d at 501–02.

While *Shannon* and *Rabe* might appear to support petitioners' contention that a separate action against the insurer survives dismissal of a claim against the insured, we nevertheless do not believe that these cases mandate a result different from the one which we have reached. For support, we look to *Kranzush v. Badger State Mut. Casualty Co.,* 103 Wis. 2d 56, 307 N.W.2d 256 (1981). The issue presented for review in that case was "whether a tort victim can bring an action against the tortfeasor's insurer for bad faith in failing to settle the victim's claim." *Id.* at 57. After determining that common law principles did not support the imposition of such an action, the court in *Kranzush* proceeded to examine sec. 632.24, Stats., the direct action statute, to see whether it could afford the plaintiff the right to proceed against the insurer. The court decided that the statute similarly could not be utilized as a basis for a claim for relief against the insurer, stating that,

> "While it is no doubt true, as the petitioner suggests, that this section [sec. 632.24, Stats.] is intended to facilitate recovery by injured parties, it is clear from the language of the statute that the liability to which the insurer is exposed is predicated upon the liability of the insured. *See: Ritterbusch v. Sexmith,* 256 Wis. 507, 41 N.W.2d 611 (1950). Under this section the claimant has a right of action against the insurer only to the extent that he has the same right of action against the insured for his negligence. Clearly, it does not provide a right of action against the insurer for a separate, intentional tort committed by the insurer." *Id.* at

75. Also, *see Tierney v. Lacenski,* 114 Wis. 2d 298, 303–04, 338 N.W.2d 320 (Ct. App. 1983).

■ While the facts in *Kranzush* are not directly in accord with those present here, and while the holdings in *Shannon* and *Rabe* might appear to temper the quoted language in *Kranzush,* we nevertheless hold that, as stated in *Kranzush,* limitations applicable to the insured should likewise be applicable to the insurer. *Rabe* and *Shannon* are distinguishable from *Kranzush* and the instant case. The former cases, as noted, involved two potentially negligent parties: the employee tortfeasor and the municipality, alleged to be vicariously liable under the theory of *respondeat superior.* In each of these cases, it would have been inequitable to absolve the employee (or the employee's insurer) of the potential for liability simply because the plaintiff was foreclosed for procedural reasons from proceeding against the employer-municipality. The reason is that, as we stated in *Shannon,* the potential for vicarious liability against the employer under *respondeat superior* principles

> does not shield the negligent employee from his own personal liability, nor does it supplant his liability with that of his employer. It provides only an alternative, and in some cases a more lucrative, source from which the injured party may recover his damages. 94 Wis. 2d at 370.

Thus, the liability of the employee (or the employee's insurer) is not dependent upon the liability of the

employer; the plaintiff may proceed against either or against both. In contrast, as stated in *Kranzush,* liability under the direct action statute is wholly predicated upon the liability of the insured. Unless the insured is liable, the insurer cannot be held liable. Consistent with our recognition of the interrelated nature of the claims against the insured and the insurer, the insurer may not be held liable in an amount in excess of the maximum potential liability of the insured. Since sec. 893.80(3), Stats., limits the amount recoverable against a governmental subdivision to $50,000, the liability of the insurer should also be so limited.

Petitioners finally argue that the decision of the court of appeals totally ignores the policy presumably underlying Wisconsin's direct liability statute. Citing *Frye v. Angst,* 28 Wis. 2d 575, 137 N.W.2d 430 (1965); *Loy v. Bunderson,* 107 Wis. 2d 400, 320 N.W.2d 175 (1982); and *Rauch v. American Family Ins. Co.,* 115 Wis. 2d 257, 340 N.W.2d 478 (1983), petitioners characterize that public policy as one which seeks to "incorporate into ... liability policies, by operation of law, the broadest possible coverage to protect third parties." *Frye,* 28 Wis. 2d at 580. Petitioners argue that this public policy concept is ignored by limiting the insurer's liability to that of the insured's potential liability.

We do not believe that our holding in any way contradicts Wisconsin's public policy favoring recovery by injured parties against liability insurers. Injured parties retain the right to proceed against the insurer, just as before. And, an injured party continues to be afforded maximum protection, *consistent*

*with* the maximum level of protection which is afforded via statute. Sec. 893.80(3), Stats.

The cases cited by petitioners are peculiar to facts involving automobile liability policies, *Frye,* 28 Wis. 2d at 580; *Loy,* 107 Wis. 2d at 424; *Rauch,* 115 Wis. 2d at 267. The principles expressed in *Frye, Loy,* and *Rauch* certainly continue to be applicable within their respective factual frameworks; however, it is equally evident that the legislature saw fit to treat the liability of municipalities independently of other forms of liability. Because we cannot ignore the statutory mandate of a $50,000 municipal liability cap, and given our belief that the liability policy should be construed to comport with those statutory liability limits, we hold that Home Indemnity may not be held liable for any amount in excess of $50,000, the maximum cap on municipal liability.

### III.

Separate and apart from the initial question of whether Home Indemnity could be held independently liable for an award of damages in excess of $50,000, up to its stated policy limit, we must consider the additional question of whether the City has waived the $50,000 municipal liability cap. Specifically, the issue is whether the City, merely by entering into a contract for insurance coverage in excess of the municipal liability limit, impliedly waived the maximum level of liability as provided for by sec. 893.80(3), Stats. We hold that the answer to that question is no.

We have previously defined waiver as a "voluntary and intentional relinquishment of a known right." *Employers Ins. of Wausau v. Sheedy,* 42 Wis. 2d 161, 166, 166 N.W.2d 220 (1969). Intent to waive is

128

regarded as an essential element of waiver. *Bank of Sun Prairie v. Opstein,* 86 Wis. 2d 669, 681, 273 N.W.2d 279 (1979). While the intent to waive may be inferred as a matter of law from the conduct of the parties, *see, Pabst Brewing Co. v. Milwaukee,* 126 Wis. 110, 117, 105 N.W. 563 (1905), waiver is to be determined as a question of fact where the inference cannot be conclusively established as a matter of law. *Employers Ins. of Wausau,* 42 Wis. 2d at 166.

There are three leading cases in Wisconsin dealing with the issue of waiver: *Marshall,* 18 Wis. 2d 496; *Sambs,* 66 Wis. 2d 296; and *Stanhope,* 90 Wis. 2d 823.

In *Marshall,* this court addressed the issue of whether the defendant municipality waived its governmental immunity by: (1) contracting for liability insurance and (2) specifically providing in the applicable liability policy that the insurer would refrain from raising the defense of governmental immunity against claims brought by injured third parties. We stated in *Marshall* that,

> "In the case at bar, it is apparent the city intended to step down from its pedestal of immunity. The policy of insurance was a contract between the city and the insurer. Its terms as alleged in the complaint provided the insurer would defend any action for damages against the city based on negligence. . . . The policy also provided the insurer would not raise the defense of governmental immunity. This important provision of the liability policy is commonly understood to mean the insurer, who is in control of the defense, will not raise such defense on behalf of the insured against the claimant. . . . We construe this agreement to be a waiver of governmental immunity by the city

recognized and agreed to by the insurer." 18 Wis. 2d at 501.

We further stated that, "We do not hold, however, a municipality waives its immunity when it takes out a liability policy which does not contain the condition or agreement to refrain from raising the defense of governmental immunity." *Id.* at 502. In subsequent cases, we have declined to find waiver based merely upon the existence of a contract for insurance, when that contract contained no condition or agreement requiring the insurer to refrain from raising the defense of governmental immunity. *See, Koenig v. Milwaukee Blood Center, Inc.,* 23 Wis. 2d 324, 335, 127 N.W.2d 50 (1964); *Niedfelt v. Joint School Dist.,* 23 Wis. 2d 641, 645, 127 N.W.2d 800 (1964). For a similar holding involving religious immunity, *see, Wojtanowski v. St. Josaphat's Congregation,* 34 Wis. 2d 1, 4, 148 N.W.2d 54 (1967).

As for *Sambs* and *Stanhope,* petitioners argue that these cases are not inconsistent with their contention that waiver can properly be found in this case. Petitioners essentially argue that the court of appeals erred in holding that, in order for waiver to lie, it must be "specific or express." Rather, they contend that in so holding, the appeals court misread *Sambs* and *Stanhope* to require explicit and express waiver and that, in fact, waiver may lie when the *conduct* of the parties creates an inference of waiver (citing *Pabst,* 126 Wis. at 118). The conduct alleged to create the inference of waiver, petitioners argue, is the act of purchasing liability insurance. Further, when the purchase of the policy is combined with language in the insurance contract to the effect that the insurer will be liable up to the policy limits,

petitioners argue that an additional impetus to justify a finding of waiver is present.

In *Sambs,* we considered the issue of whether the municipality waived the statutory limitation on liability *pro tanto* when it purchased a liability contract with limits that exceeded the statutory cap. After noting this court's refusal to extend the *Marshall* waiver rule to cases where the waiver of immunity defense clause was not set forth in the contract of insurance, we stated that,

> "In the present case there is no clause in the insurance policy prohibiting either use of the immunity defense or reliance on the statutory liability limitation. ...
>
> "The plaintiff has directed our attention to cases in other jurisdictions which have held that the defense of immunity can be waived without there being a specific clause in the insurance policy prohibiting the assertion of the defense. We do not find these authorities persuasive in view of the fact that the *Marshall Case* and the subsequent decisions of this court specifically reject this approach ....
>
> "... The total absence of any language indicating waiver of the defense leads us to conclude the defendant did not intend to waive the partial defense when it purchased the instant contract of liability insurance." 66 Wis. 2d at 315–17.

Thus, *Sambs* should be read to require express policy language indicating that a waiver was intended. We do not believe that the mere purchase of excess liability coverage, even when combined with language in the policy stating that the insurer shall be liable up to the policy limits, constitutes waiver consistent with our holding in *Sambs.* The policy makes no reference

to municipal liability or limitations on the insurer's liability.

Nor does the policy explicitly prohibit the assertion of governmental immunity or the statutory liability limits as a defense to a tort suit. It was such an explicit statement which justified this court's finding of waiver in *Stanhope* and which distinguished it from *Sambs.* 90 Wis. 2d at 846. Thus, in *Stanhope,* the combination of the purchase of excess insurance coverage *plus* the stated prohibition against raising the defense of governmental immunity provided a basis for a finding of waiver. Also, *see Stanhope,* referring to the municipality's purchase of a policy containing a "specific waiver endorsement," *id.* at 851; and elsewhere referring to a municipality's *express* waiver of the defense of statutorily imposed governmental immunity, *id.* at 852.

We believe that the same factors which distinguished *Stanhope* from *Sambs* also serve to distinguish *Stanhope* from the present case. Here, the municipality did indeed purchase excess liability coverage; however, the insurance contract contained no express statement which could be construed to waive the liability limit or the statutory defense of limitation of recovery. Absent such a statement, we decline to hold that the City waived its governmental liability limits simply by being a party to an insurance contract which authorized recovery up to the policy limits. The policy statement authorizing recovery up to the policy limits cannot be construed to constitute a waiver either of the statutory liability limits or of

raising the defense of governmental immunity.[8] Therefore, there can be no finding of waiver.

## IV.

We now turn to the issues raised by the City and Home Indemnity's petition for cross-review.

### A. Apportionment of Negligence

The cross-petitioners first argue that a new trial in the interest of justice is required because the jury apportionment of 100 per cent of the causal negligence to the City was so motivated by jury passion and prejudice as to be incredible as a matter of law. Cross-petitioners contend that Pyro, Galaxy, and/or the Gonzalez should have been found contributorily negligent and that the failure of such a finding by the courts below justifies a new trial in the interest of justice.

We do not treat a request for a new trial in the interest of justice lightly. "'This court is reluctant to grant a new trial in the interest of justice and exercises its discretionary power only in exceptional cases.'" *State v. Friedrich,* 135 Wis. 2d 1, 35, 398 N.W.2d 763 (1987), quoting *State v. Cuyler,* 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983). An "exceptional" case exists if it is established that there has been a miscarriage of justice, and a retrial under optimum

---

[8]Our statement in *Pabst,* 126 Wis. at 118, that the intent to waive may be inferred by the parties' conduct, when considered alone, should not be controlling. While we have later recognized the same principle, *see, Employers Ins. of Wausau,* 42 Wis. 2d at 166, we have also said that "[waiver] is to be determined as a question of fact where the inference does not conclusively arise as a matter of law." *Id.*

circumstances might produce a contrary result. *Cuyler,* 110 Wis. 2d at 142. We do not believe that either of these elements is present here.[9]

A jury's apportionment of negligence and its award of damages will be sustained if there is any credible evidence that supports the verdict, sufficient to remove the question from the realm of conjecture. To reverse, this court must conclude that there is such a complete failure of proof that the verdict must have been based on speculation. *Sabinasz v. Milwaukee & Suburban Transport Corp.,* 71 Wis. 2d 218, 222–26, 238 N.W.2d 99 (1976); *Coryell v. Conn,* 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979). The reviewing court looks at the evidence in the light most favorable to sustain the verdict. *Krueger v. Mitchell,* 112 Wis. 2d 88, 105, 332 N.W.2d 733 (1983). Thus, when more than one inference may be drawn from the evidence presented at trial, this court is nevertheless bound to accept the inference drawn by the jury. *Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305–06, 347 N.W.2d 595 (1984); *Sumnicht v. Toyota Motor Sales,* 121 Wis. 2d 338, 360, 360 N.W.2d 2 (1984).

Utilizing these standards, we believe that the appeals court was correct in ruling that the jury verdict was supported by credible evidence, and we find that its reliance on the following factors to reach that conclusion was appropriate:

---

[9]Cross-petitioners later argue that the combination of several suggested evidentiary errors provides an additional basis for ordering a new trial in the interest of justice. With respect to these arguable errors, we do not believe that the standard for granting a new trial in the interest of justice has been satisfied.

(1) The City, via two of its employees, conceded that it alone was responsible for cleanup of the launching pad area subsequent to the fireworks display and Fourth of July festivities in Lions Legend Park;

(2) the City's contract with Galaxy contained no representations by Galaxy that it would in any way be responsible for the cleanup operations; and

(3) the record does not definitively establish that the offending explosive originated either with Pyro or with Galaxy, since parties other than Galaxy also shot off fireworks in the park area on the Fourth of July.

Based on these factors, we cannot say that the jury award in attributing liability to the City, and not to Pyro or Galaxy, was speculative. The fact that other inferences could have been drawn from the evidence does not mean that the jury verdict should be overturned. We must search the record for any credible evidence which could sustain the jury verdict; we are not required to search the record for evidence to sustain a verdict which the jury could have reached, but did not. *Fehring,* 118 Wis. 2d at 305–06; *Sumnicht,* 121 Wis. 2d at 360. The factors cited above more than satisfy the "any credible evidence" standard by which we are bound.

The same holds true with respect to the jury's finding of lack of contributory negligence on the part of seven-year-old Miguel, Jr. and his father, Miguel, Sr. According to cross-petitioners, Miguel, Jr. should have been found contributorily negligent because the boy had admitted at trial that he knew the ball-like object he found in the park on the day in question was dangerous. Because of this knowledge, cross-petitioners argue that Miguel, Jr. should not have benefitted

by application of the legal doctrine which states that "[a] child of tender years is not held to the same degree of care as an adult." *Rossow v. Lathrop,* 20 Wis. 2d 658, 663, 123 N.W.2d 523 (1963). However, a child, though seemingly cognizant of the potential for danger, may not have the "prudence, discretion, or thoughtfulness to avoid the hazards and risks to which they expose him." *Goldberg v. Berkowitz,* 173 Wis. 603, 606, 181 N.W. 216 (1921). The jury made the fact determination that Miguel, Jr. was not contributorily negligent, and we will not disturb that finding. We also find no basis to overturn the analogous finding with respect to Miguel, Sr.

The cross-petitioners also argue that both father and son could have been held liable under the fireworks safety statute, sec. 167.10, Stats. (1981–82).[10] A finding of *per se* negligence based on the violation of a safety statute must be shown by proof beyond a reasonable doubt, expressed in language that is clear, unambiguous and peremptory, indicating that the safety statute is meant to apply. *Burke v. Milwaukee & Suburban Transport Corp.,* 39 Wis. 2d 682, 690, 159 N.W.2d 700 (1968). To apply the principles of negligence *per se* to find an individual liable, it must be established that the harm suffered was of the type the

---

[10]That statute provides, in pertinent part, as follows: "It is unlawful for any person to sell, expose or offer for sale, use, keep, discharge or explode any firecrackers, blank cartridges, toy pistols or cannons, toy canes or cannons in which explosives are used, contrivances using explosive caps or cartridges, sparklers, display wheels, ... sky rockets, Roman candles, aerial salutes, American or Chinese bombs or other fireworks of like construction, or any fireworks containing any explosive or flammable compound ... within the state of Wisconsin, except as hereinafter provided."

statute was designed to prevent and that the injured person was in the class of individuals sought to be protected. *Betchkal v. Willis,* 127 Wis. 2d 177, 184, 378 N.W.2d 684 (1985), citing *Walker v. Bignell,* 100 Wis. 2d 256, 268, 301 N.W.2d 447 (1981). Miguel, Jr. fell within the class of protected individuals. However, given that safety statutes are to be narrowly construed and that the class of persons protected and hazards protected against is "'limited ... to the intendment of the statute,'" *Fleury v. Wentorf,* 82 Wis. 2d 105, 110, 262 N.W.2d 68 (1978), citing *Clark v. Corby,* 75 Wis. 2d 292, 299 n. 9, 249 N.W.2d 567 (1977), we believe that the jury's conclusion of lack of negligence based upon violation of a safety statute is not without foundation. Smoke bombs are not specifically covered by the statute, and there is no support to establish, beyond a reasonable doubt, that the statute was meant to apply. As the appeals court succinctly stated, it has not been established that the statute was meant to be applicable to the peculiar

> hazard of detonation by a seven-year-old boy of a firework which he believes to be a smoke bomb and which he discovered only through the negligence of the party claiming the protection or benefit of the statute. We cannot say that the statute applies beyond a reasonable doubt here. 128 Wis. 2d at 497.

Nor was it unreasonable for the jury to conclude that the statute did not apply to the actions of Miguel, Sr. in reaching for the explosive in a futile attempt to avoid injury to his children. We therefore affirm the court of appeals on this issue.

## B. **Evidentiary Rulings**

The issues next raised by cross-petitioners deal with the exclusion of two pieces of information: (1)

Miguel, Sr.'s status as a Mexican-born, illegal alien and (2) the fact that Miguel, Sr. had not filed United States tax returns.

First, the trial court granted petitioners' motion *in limine* prohibiting the City and Home Indemnity from introducing into evidence information relating to Miguel, Sr.'s illegal-alien status. The trial court determined, after balancing the possible prejudicial effect of the introduction of such evidence against its likely probative value, that the evidence should not be admitted. Cross-petitioners now argue that the trial court's suppression order affected their ability to present evidence relevant to the issue of Miguel, Sr.'s future loss of earning capacity. Cross-petitioners sought to question the petitioners' expert witness regarding the Mexican labor market and Miguel, Sr.'s loss of earning capacity in Mexico. Due to Miguel, Sr.'s status as an illegal alien, these factors were presumably relevant because Miguel, Sr. could be deported at any time.

Under sec. 904.03, Stats., otherwise relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice ...." Evidence is prejudicial if it has "'a tendency to influence the outcome by improper means' or if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish' or otherwise causes a jury 'to base its decision on something other than the established propositions in the case.'" *Lease America Corp. v. Ins. Co. of North America,* 88 Wis. 2d 395, 401, 276 N.W.2d 767 (1979), citing *Christensen v. Economy Fire & Casualty Co.,* 77

138

Wis. 2d 50, 61, 61 n. 11, 252 N.W.2d 81 (1977). A court's rulings on evidentiary issues will be upheld absent an abuse of discretion. *Featherly v. Continental Ins. Co.,* 73 Wis. 2d 273, 283, 243 N.W.2d 806 (1976); *State v. Wollman,* 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979).

Cross-petitioners argue that the probative value of Miguel, Sr.'s illegal-alien status exceeded its prejudicial effect. They cite *Melendres v. Soales,* 105 Mich. App. 73, 306 N.W.2d 399 (1981), to support this assertion. In *Melendres,* the court determined that evidence regarding the plaintiff's illegal-alien status could be admitted, stating that,

> "due to plaintiff's status as an illegal alien he was subject to deportation to Mexico at any time. The wages plaintiff could expect to receive in Mexico were significantly lower than those he received in this country. Under these circumstances, the jury had a right to know of plaintiff's illegal status when calculating damages." 105 Mich. App. at 78, 306 N.W.2d at 402.

The court stated that, on remand for a new trial, introduction of such evidence would be restricted to the damages phase, not the liability phase, of the *bifurcated* retrial. This restriction was necessary to avoid prejudice. 105 Mich. App. at 78–79, 306 N.W.2d at 402.

The appeals court made reference to the bifurcation of the retrial in *Melendres* and to the fact that bifurcation was not sought here.[11] 128 Wis. 2d at 499 n.

---

[11]Cross-petitioners' counsel, at oral argument, appeared to concede that the trial court ruling on the admissibility of evidence

4. It also correctly stated that no offer of proof was made "by any defendant that deportation was anything other than a speculative or conjectural possibility." *Id.* at 498 n. 3.[12] Based upon these factors, and given the obvious prejudicial effect of the admission of such evidence, we do not believe that the appeals court erred in affirming the trial court's exercise of discretion.

Cross-petitioners present a related argument that the trial court abused its discretion in withholding evidence from the jury relating to Miguel, Sr.'s failure to file United States income tax returns. The suppression of this evidence arguably impaired cross-petition-

---

pertaining to Miguel, Sr.'s illegal-alien status was proper since bifurcation was never requested. However, counsel stated that evidence regarding the Mexican labor market and Miguel, Sr.'s loss of earning capacity in Mexico should have been admitted. Counsel contended that this information could have been presented at trial without making reference to Miguel, Sr.'s status as an illegal alien. But counsel did not specify how that evidence could have been introduced without bringing up the potentially prejudicial information, and there is no reference in the record to an offer of proof which might have been made in this regard.

[12]We make note of recently enacted federal legislation which adjusts the status of an alien to that of an alien lawfully admitted for permanent residence if certain conditions are met, including one condition requiring continuous residence in the United States in an unlawful status since any date prior to January 1, 1982. Other procedural requirements are also enumerated. *Immigration Reform and Control Act of 1986,* Pub. L. No. 99–603 sec. 201, 100 Stat. 3359 (codified as amended at 8 U.S.C. 1255 sec. 245A). Though we do not know whether Miguel, Sr. has taken advantage of this provision or could comply with each of its procedural requirements, we note that he would meet the unlawful residence time length requirement since he has resided in this country since 1971. The existence of this legislation makes the possibility of deportation even more speculative than before.

ers' efforts on cross-examination to impeach petitioners' expert witness on the issue of damages. Again, the standard we utilize is one of abuse of discretion; we must uphold the trial court's ruling if its discretion was properly exercised, in accordance with accepted legal principles and with the facts on the record, regardless of whether or not we agree with that ruling. *State v. Wyss,* 124 Wis. 2d 681, 707, 370 N.W.2d 745 (1985).

We do not believe that the trial court abused its discretion in prohibiting the attempted impeachment of the petitioners' witness with respect to his conclusions about Miguel, Sr.'s loss of future earning capacity. We express reservations about the quality and quantity of resources used by the economist to aid in his opinions about the nature and extent of damages. However, as noted by the appeals court, the City and Home Indemnity were permitted to cast doubt upon the conclusiveness of the sources on which the economist relied.[13] Cross-petitioners now argue that "[i]t would have been a simple matter to permit defense counsel to ask if [petitioners'] economist had reviewed income tax returns. A negative answer to that inquiry would put an end to the matter—nothing need be said about the failure to file." We fail to see how the question proposed by cross-petitioners is significantly different from the question authorized by the trial court. Surely a jury might reasonably infer that an income tax return would fall into the category of "traditional documentation" of earnings. We do not

---

[13]The trial court authorized the question, "'It is true, is it not, that you were not provided with all of the traditional documentation relating to earnings prior to the injury?'" 128 Wis. 2d at 499.

141

believe that authorizing a question similar to that which cross-petitioners now advance would have served to cast any more doubt upon the economist's conclusions that did the actual, authorized question.[14] The trial court did not abuse its discretion in prohibiting further questioning on this matter.

The final question raised in cross-petitioners' brief deals with the admission, over counsel's objections, of a mortality table. The table was introduced by petitioners to help gauge, *inter alia,* future loss of earning capacity. Cross-petitioners argue that, in precluding the introduction of evidence regarding Miguel, Sr.'s illegal-alien status, they were not able to point out to the jury that the table, which measured life spans for male Caucasian United States citizens, was not applicable to Miguel, Sr. According to cross-petitioners, the table was inapplicable because "Miguel Gonzalez, Sr. was not born in the United States, was not raised in the United States and was not assured that he could remain in the United States—as an illegal alien he was subject to deportation at any time." Thus, cross-petitioners' objection here appears to be based solely on the inability to bring out evidence regarding Miguel, Sr.'s *status* as a Mexican citizen and illegal alien, not simply on differences in life expectancies between males of various races. The trial court did not abuse its discretion in determining that admission of evidence regarding Miguel, Sr.'s

[14]In any case, evidence regarding the lack of availability of tax returns may have been probative of Miguel, Sr.'s status as an illegal alien, a subject which the trial court correctly determined could not be delved into without the potential for substantial prejudice.

illegal-alien status could be highly prejudicial. In any case, cross-petitioners failed to offer an alternate set of mortality tables to measure life expectancy, and the jury received a cautionary instruction on the possibility for error in statistical data. Under these circumstances, we decline to hold that the trial court abused its discretion in admitting the mortality table.

*By the Court.*—The decision of the court of appeals is affirmed.